MARY E. SMITH *vs.* ADDISON T. HALL.

Third Judicial District, New Haven, June Term, 1897. ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

| 69 | 651 |
| s71 | 428 |
| 69 | 651 |
| 73 | 498 |
| 73 | 499 |
| 73 | 662 |

A new trial for a verdict against evidence will not be granted unless the damages are flagrantly excessive, or the verdict in other respects is manifestly against the evidence.

A promise of marriage made to a woman known to be married is void. But evidence of the relations of the parties prior to the time the woman obtained a divorce, is relevant upon the question whether a promise of marriage was subsequently made to her, and admissible also to show

the circumstances under which services, claimed to have been rendered by her, were performed.

A witness for the plaintiff in an action for breach of promise of marriage was asked if she had heard the defendant say what he considered his real estate to be worth, and replied that he had frequently spoken of it as worth between $50,000 and $60,000. *Held* to be inadmissible, as hearsay, but harmless in view of similar statements which the defendant himself admitted he had made to the witness.

In an action for breach of promise of marriage the character of the plaintiff for chastity, when attacked, can always be sustained by evidence of reputation.

Some months after the plaintiff had been divorced the defendant promised to marry her. *Held* that no right of the defendant had been prejudiced by the divorce judgment, and that he was in no position to collaterally attack that judgment, even if it had been secured by fraud.

Certain instructions to the jury in relation to the degree of mental capacity required to make a valid engagement of marriage, and as to what conduct on the part of the plaintiff would justify the defendant's breach of his promise, — *held* correct, apt, and sufficient for the guidance of the jury.

The plaintiff, who had been engaged to be married to the defendant, sought, under the first count of her complaint, to recover the value of her services rendered to the defendant pending their engagement, in consideration of and in reliance upon the defendant's promise of marriage; and in the second count to recover damages for the breach of his promise to marry her. *Held* that inasmuch as the recovery of damages for the defendant's breach of his promise to marry would be the legal equivalent of the performance of that promise, the plaintiff could not get that equivalent and the value of her services in addition; and that the failure of the trial court to so instruct the jury entitled the defendant, against whom the jury returned a general verdict, to a new trial unless the plaintiff would remit the amount claimed for services under the first count.

[Argued June 10th—decided October 5th, 1897.]

ACTION to recover damages for breach of promise of marriage, and compensation for services rendered, brought to the Superior Court in Litchfield County and tried to the jury before *Ralph Wheeler, J.;* verdict and judgment for the plaintiff for $5,310, and appeal by the defendant for alleged errors in the rulings and charge of the court. *Error and new trial granted nisi.*

The defendant also moved for a new trial, first in the Superior Court and then in this court, upon the ground that the verdict was against the evidence, and that the damages awarded were excessive. *Motion denied.*

The complaint contained two counts, the first consisting of the " common counts," and the second being a special count setting forth a breach of promise of marriage. Under the first count the following bill of particulars was filed :—

" Addison T. Hall, To Mary E. Smith, Dr.

" To services rendered and time expended in nursing, caring for and attending to said Hall, at his request, from November 1st, 1892, to January 1st, 1894, sixty and four-sevenths weeks, at thirty dollars per week   .    .    .    $1817.12

" To interest   .    .    .    .    .    .    .    .    "

The answer consisted of a general denial of all the allegations of the complaint, and the three following special defenses to the second count, namely : " 1. The defendant has paid to the plaintiff all that there was ever due from him to her, upon the matters stated in the first count. 2. The plaintiff has been a person of immoral character and habits, and has been the keeper of a bed-house ; which facts became known to the defendant subsequently to, and were not known by defendant previous to, the making of the pretended promises in said second count alleged, if any such were made. 3. At the time of the alleged promise of the defendant he was of unsound mind, and mentally incapable to make or enter into the contract or promise alleged."

The reply denied the truth of the matters contained in these special defenses.

Upon the trial the plaintiff offered evidence to prove and claimed to have proved, in substance, the following facts. She first met the defendant in September, 1892. She was then about thirty years of age and the defendant about forty-three. She had resided in Woodbury in this State all her life, except as hereinafter stated. She had been married in 1883, to Dudleigh Smith, then of Woodbury, and had a son living, the issue of that marriage, born in December, 1883. Her husband, in the early part of 1885, left Woodbury for Colorado to seek employment, and she was to join him there with her boy as soon as her husband was so situated as to be able to receive them. In the spring of 1886, as she was

about to set out for Denver, Colorado, to join her husband at his request, she received from him a postal card dated June 9th, 1886, telling her not to start till she heard from him again, as he had been called to Leadville and did not know just when he should return to Denver. She resolved to go on and visit some friends in the West until she should further hear from her husband, writing him to this effect, and thereupon proceeded to Galesburg, Illinois. She never heard from her husband thereafter, nor obtained any tidings whatever concerning him. After a time she went to Minneapolis, took a house having sixteen rooms and rented the same to lodgers. She finally sold out this business and returned to Woodbury, in March, 1888, where she has since resided. In the course of two weeks after she first met the defendant he became quite personal in his attention to her, whereupon she informed him of the above facts, and said to him that while she had every reason to believe her husband was dead, she had no actual nor positive proof of the fact.

The defendant then told of his past experiences, having been married twice; that he was in ill health, retired from business and anxious to have a home. He asked her to marry him, stating that he was worth fifty thousand dollars, consisting of real estate on Crown street, New Haven, and some bank stock. She declined to accept his offer then, but assented to his request that he might call upon her in Woodbury. In October, 1892, the defendant wrote to her several letters, and on the 25th of that month came to Woodbury, spending some days there, mostly in her company; and during this visit she showed him some, and read to him others, of the letters from her husband, including the postal card aforesaid, of June 9th, 1886. The defendant, during this visit, said he agreed with her in the belief that her husband was probably dead, and again asked her to marry him and go south for the winter, but she refused to consent to this, without obtaining a divorce. Defendant thereupon "urgently insisted that she should begin divorce proceedings at once, and yielding to his importunities in this regard, she applied for a divorce, which was granted May 2d, 1893," on

the ground of desertion. Afterwards the defendant called upon the plaintiff in Woodbury, several times, and wrote her several letters; and in December, 1892, came to Woodbury and requested the plaintiff to obtain board for him at her grandmother's, with whom the plaintiff resided, and this was done. The defendant continued to board there from that time, with some few brief absences, till the latter part of November, 1893.

At the time the divorce was granted a building was being erected for the defendant on his Crown street property, and in May, 1893, shortly after the divorce was granted, the defendant promised to marry plaintiff as soon as the building was erected and rented, and she agreed to marry him. "The defendant testified that he promised to marry her when the block was completed, but that this promise was made by him in July, 1893, instead of in May, as the plaintiff claimed." The building was completed and rented in October, 1893.

While defendant was thus boarding in Woodbury, he was sick and nervous a good deal of the time, and the plaintiff cared for and waited upon him in his sickness, bathed him in alcohol and salt water, gave him his medicines day and night, and in general performed all the offices of a nurse. It was for these services that plaintiff sought to recover under the first count. "The plaintiff did not claim that there was any express agreement that the defendant should pay her for services rendered, but did claim that the services were rendered at his request and in reliance upon, and as a consideration for, the promises of marriage made by the defendant."

In November, 1893, the plaintiff requested the defendant to fulfil his promise of marriage, but he then and ever after, without any sufficient reason, refused to do so, and in June, 1896, married another woman.

The defendant was a witness in his own behalf, and a portion of his testimony was to the effect following, to wit: That he could not and would not marry the plaintiff, because of the stories he had heard (after leaving her grandmother's house just before Thanksgiving time) reflecting upon her

moral character; that he had heard from a stranger, a drummer whose name he could not ascertain, that she had, while in Minneapolis at the time referred to, kept a house of ill-fame; that he had also heard the same story from one George H. Ford, who resided in Waterbury, but who had for many years resided in Woodbury, and who was well acquainted with the plaintiff and her reputation; that his sister had informed him that she had heard that the plaintiff was a crooked woman; that one of his sisters at one time called the plaintiff a vile woman in his presence; that he believed the story told him by George Ford, because Ford had been out west; that Woodbury people laughed at him because he was boarding there with the plaintiff; that the stories that he had heard as to her conduct aforesaid worried him so he could not sleep, and that therefore he went and called upon her, thinking that she would deny the stories; that he told her, the plaintiff, of the stories he had heard concerning her, and that she admitted to him that such stories were true of her; (this was denied by the plaintiff); that he had been informed that her boy was born in about eight months after she and its father had been married; (the defendant admitted, however, in the course of his examination, that the plaintiff had told him that the birth of the boy was hastened by a fall which she sustained); that he said to her, at the time he reported to her the stories he had heard of her conduct aforesaid, referring to one Dr. Ketchum who had formerly resided in Woodbury: "I believe Dr. Ketchum has slept with you more times than I have got hairs on my head. Now I am sorry to say it, for you and your boy's sake. I shall not marry a crooked woman, unless I am married asleep;" that subsequently on two occasions, without his consent and against his protest, the plaintiff entered his room and got into bed with him, with nothing but her night clothing upon her.

Said George H. Ford was produced as a witness on the part of the plaintiff, on rebuttal, and denied that he had ever said to the defendant anything of the kind aforesaid, or anything reflecting upon the character or reputation of the plain-

tiff; but upon the contrary, that in the fall of 1892 he met the defendant in Waterbury, and was informed by the defendant that he had recently met the plaintiff at his sister's house in Wallingford; that he liked her and inquired of the witness Ford what kind of a lady she was, and that thereupon Mr. Ford told him that she was a lady of very high standing in Woodbury.

The defendant also offered evidence to prove and claimed to have proved, that the plaintiff's services to him were of a trivial nature and had been fully paid for by him; that the plaintiff never told him until February, 1894, about her keeping the house in Minneapolis; that he never told her he owned any bank stock, and never had owned any; and that after the completion of the Crown street building he had no other property save the Crown street property. He further claimed to have proved " that he had been and continued to be actually insane, and was at least a large part of the time incapacitated for attending to business. The plaintiff offered testimony to prove, and claimed to have proved, that the defendant was of sound mind and of full capacity for transacting business."

Upon the trial the defendant objected to the evidence as to what was said between the plaintiff and defendant, and as to what took place between them by correspondence or otherwise, prior to the granting of the divorce, on the ground that plaintiff was then a married woman. The plaintiff's counsel claimed it to show " the relations between the parties, and also the circumstances under which the plaintiff had performed the services " for the defendant, and for no other purpose; and expressly stated to the court and jury that he did not claim it as tending to show any promise of marriage prior to the granting of the divorce. The court admitted the evidence.

The plaintiff called as a witness one Alice Martin, who, referring to the property of the defendant upon Crown street, and to what the defendant had stated to her in 1894 concerning its value, was asked the following question: " State whether or not at any time he said anything to you in regard

to what he considered it worth?" The defendant objected to this question, "as not being an admission against interest." The objection was overuled, the defendant excepting, whereupon the witness answered: "He frequently spoke of it as being worth between $50,000 and $60,000." The defendant subsequently testified, upon the question of the value of this property, that its value in 1894 in his opinion was $25,000 or $28,000 perhaps, but that he didn't think it was worth as much now. The defendant also testified and offered evidence to prove, that the property was incumbered by a mortgage for $17,000 and that his entire indebtedness was $19,000 or $20,000. He admitted, however, on cross-examination, that in writing in 1894 to Alice Martin, referring to this same property, he had stated in his own handwriting as follows: "The broker that I wrote about from Barrington offered me $45,000 for my block to-day, but I laughed at him. I am sure he would give $50,000, but that can't buy it." The defendant called as a witness his wife, who stated that she married the defendant on June 2d, 1896, and had been acquainted with him since June 21st, 1895; that her family consisted of Mr. Hall, herself, her two children by a former husband, and her mother. The following question was asked by the defendant, referring to the Crown street property: "Have you any means of support other than the income from this building?" Counsel for the plaintiff objected to the question, and the court sustained the objection in effect, the defendant excepting. The defendant urged that the testimony was admissible upon the question of punitive damages, which the plaintiff claimed. The same witness was also asked by defendant the following question, referring to the defendant: "Do you know whether he is and has been assisting in the support of his father, and if so, to what extent?" This was objected to by the plaintiff and excluded, the defendant excepting. The defendant was allowed, however, to testify upon this subject as follows: that in 1893 and 1894, and for years previous thereto, he had supported his father, bought his clothing and paid his board;

that in 1894 he was paying $10 a month for his board, and that his father was eighty-three years old.

The defendant having testified as to the reason why he didn't marry the plaintiff, and to his relations with her during the summer and fall of 1893, and that he had intended to marry her, was asked upon cross-examination the following question, referring to the plaintiff: "Didn't you love her?" This was objected to, on the ground that it was not germane to the direct examination. The objection was overruled, the defendant excepting. The witness answered, "I thought well of her, yes, sir." He subsequently testified on cross-examination, without objection, as follows: "Did you intend, Mr. Hall, by anything you said, or by your conduct, to give her to understand that you loved her? Why, of course I did."

The plaintiff introduced the evidence of one Charles A. Baldwin, one of the assessors of the town of New Haven, as to the value of the Crown street property, in 1893, and that it was then worth in his opinion from $35,000 to $40,000. The defendant called as a witness in his behalf one William H. Hewitt of New Haven, who testified that in his opinion the value of the property in question in 1894 was "about $25,000,—not to exceed that;" whereupon he was asked by counsel for the defendant: "How long a time would it take in your judgment, to sell it for that price?" This question, on objection of the plaintiff, was excluded, the defendant excepting. The same witness Hewitt, having described the property in question, gave his reasons for his opinion that the rents would decrease and the cost for repairs would increase, whereupon he was asked the following question by counsel for the defendant: "What in your opinion would be the probability of the net income from that building realizing the expectations of a man who, without experience in that class of property, figures on the gross rent." This question, on the objection of the plaintiff, was excluded, the defendant excepting.

The plaintiff offered in rebuttal evidence of her good character and reputation for chastity, to which the defendant

objected; the court admitted the evidence and the defendant excepted.

In the course of the testimony of the defendant's wife, the following testimony from her was offered: "State whether, since you have known about this building of your husband, there has been any change as to the amount of rents paid? There has. In what direction? They have gone down." The plaintiff objected to the testimony and asked to have it excluded, on the ground that it appeared from the testimony of the witness that her acquaintance with the husband did not begin until June 21st, 1895. No claim being made on the part of the defendant that the witness had any knowledge in regard to the matter except such as she had gained since that time, the court excluded the testimony, the defendant excepting. In this same connection the witness, Mrs. Hall, was also asked on the part of the defendant: "Do you know whether the amount necessary for repairs has increased of late?" To this question the plaintiff objected and the same was excluded, the defendant excepting. Also in the same connection, the same witness was asked: "Now will you state whether Mr. Hall gave you any estimate of the prospective value and income of that building?" To this question the plaintiff objected, and the court excluded it, the defendant excepting.

The requests to charge, which the defendant in his reasons of appeal claims the court refused to give, are these: " 2. Even if the defendant was capable of attending to his ordinary matters of business, yet, if his mind was weak and he was easily excited and led, and the plaintiff supposing him to be a wealthy man, took advantage of his condition to obtain a promise of marriage, your verdict should be for the defendant. 3. If defendant had sufficient reasons for not marrying the plaintiff, to justify an honorable man in declining to marry her, the plaintiff cannot recover. . . . 6. If the plaintiff, being the superior in intellect and ability of the defendant, designedly obtained an influence over him, and exercised this influence to obtain a promise of marriage, your verdict should be for the defendant. 7. In actions for breach

of promise of marriage, a less degree of mental incapacity will suffice as a defense than would be requisite in matters of ordinary business. 8. If the defendant's mental and physical condition was such that marriage, on his part, would be contrary to public policy or a crime against society, and plaintiff knew this condition, your verdict must be for the defendant. 9. If defendant's mental and physical condition was such that no prudent or sensible woman knowing it would have married him, and plaintiff knew this condition, she cannot recover. 10. If the plaintiff has been a person of immoral character, or has kept a house resorted to for immoral purposes, defendant upon learning these facts, or upon being convinced that they were facts, was justified in refusing to marry her. 11. If the plaintiff was under an insane delusion as to the character of the defendant for chastity, or as to her having kept a house resorted to for immoral purposes, and on that account refused to marry her, your verdict should be for the defendant. . . . 13. If defendant was not actually insane, but his mental capacity was such that it would be inequitable to enforce against him a contract of marriage with the plaintiff, and this mental capacity was known to the plaintiff, your verdict should be for the defendant. 14. If plaintiff has suffered no actual damage for the failure of defendant to marry her, your verdict should be for the defendant. 15. The record of plaintiff's divorce shows that she obtained it on the ground of wilful desertion on March 4th, 1885, the time of his leaving this State. She now testifies that she received affectionate letters from her former husband in 1886, that he left this State with her approval and consent, and that she did not, and does not, believe that he deserted her, but believed and believes that he died after sending her the last communication here placed in evidence. Under these circumstances plaintiff was not entitled to a judgment of divorce until seven years from the time of said last communication. The obtaining a divorce on the ground of wilful desertion in 1885, was a fraud and an imposition upon the court, and your verdict should be for the defendant."

The court complied with these requests to charge, only so

far as appears from the charge itself, the material parts of
which, bearing upon these requests, are as follows : —

"If you find it proved that the plaintiff had kept a bed-
house and was a person of immoral character and habits,
which facts became known to the defendant subsequently to,
and were not known by him previous to, the making of his
engagement, then he was justified in breaking his engage-
ment, and your verdict on this count must be for the defend-
ant.   In the third defense to this count the defendant alleges
that at the time of the alleged promises, the defendant was
of unsound mind and mentally incapable to make or enter
into the contract or promise alleged.   Upon this subject I
should say to you that every person is presumed to be sane
until the contrary is shown, and so the burden of proving
insanity in this case is upon the defendant.   When once a
state of insanity, however, is established by the proof, the
burden is upon the other party to show a restoration to san-
ity.   To render a contract void on this ground, it must be
shown that the person had not understanding sufficient to
comprehend or know the nature, extent and consequences of
the contract he was making.   If it appears and is found in
any case that a person's reason, memory and judgment are
so overwhelmed by mental disease that he is unable, as I
say, to understand the nature, extent and consequences of
the contract into which he appears to have entered, then such
contract was, or is, invalid.   You will weigh the evidence
presented on the one side and upon the other on this subject.
If you find the defendant was insane at the time he promised
to marry the plaintiff, and that therefore there was no valid
engagement of marriage existing, your verdict should be for
the defendant upon this count.   If the jury find that there
was a valid engagement of marriage between the plaintiff and
the defendant, and that the defendant refused to perform his
promise therein as alleged in the complaint, without justifi-
cation, then the verdict would be for the plaintiff for at least
nominal damages, as some damages are implied necessarily
from a violation of the plaintiff's rights. . . If the plaintiff
has been a person of immoral character, or has kept a house

resorted to for immoral purposes, the defendant, upon learn-
ing such facts was justified in refusing to marry her. If the
defendant after his promise of marriage, became or was,
mentally or physically unfit for marriage, and has so contin-
ued since that time and the jury so find, then these facts
may be taken into consideration in fixing the amount of dam-
ages sustained by the plaintiff. If the defendant was under
an insane delusion as to the character of the plaintiff, or as
to her having kept a house of ill-fame, or if he investigated
fully in reference to those subjects and was in good faith sat-
isfied of the truth of the charges made, and the jury so find,
they may consider those circumstances in relation to the ques-
tion of damages."

With reference to the first count the court charged the
jury as follows : "Upon this part of the case I would advise
you that if you find the facts to be as claimed by the plain-
tiff, she would be entitled to recover on the first count such
sum of money as her services were reasonably worth. How
much the services were thus reasonably worth, if anything,
is a question for the jury entirely, upon the evidence ad-
duced; they remembering that the burden of proof as to the
facts upon which a recovery on this count depends, both
as to the services and their value, is upon the plaintiff. . . .
If you find the issues on the first count in favor of the plain-
tiff, you will determine the value of the services, and add
thereto the interest on the sum, at six per cent per annum,
from the date when you find the plaintiff broke his promise
of marriage, if he did break it, up to the present time, and
render your verdict accordingly on that amount."

The court did not charge the jury that they could not ren-
der a verdict both for compensation for services under the
first count and for damages for breach of promise of marriage
under the second count, nor was it requested so to charge.
The verdict was a general one, upon both counts. The
errors assigned relate to the rulings of the court upon the
evidence as above set forth, to the refusal of the court to
charge as requested, to parts of the charge as given, and to
its failure to charge that there could be no recovery upon
both counts.

*Henry F. Hall* and *Henry G. Newton*, with whom was *Clifford Gilbert*, for the appellant (defendant).

*William H. Williams*, for the appellee (plaintiff).

TORRANCE, J. This case comes before us upon a motion for a new trial for a verdict against evidence, and upon an appeal for alleged errors of the court in its rulings upon evidence and in its charge to the jury.

So far as the motion for a new trial is concerned, testing the claims of the defendant thereunder by the principles heretofore laid down by this court in the cases cited below, we are of opinion that the damages awarded to the plaintiff are not so flagrantly excessive, nor the verdict in other respects so manifestly against the evidence, as to entitle the defendant to a new trial. *Clark* v. *Pendleton*, 20 Conn. 495, 509; *Waters* v. *Bristol*, 26 id. 398, 405; *Johnson* v. *Norton*, 64 id. 134; *Brooks' Appeal from Probate*, 68 id. 294.

Upon the appeal the reasons assigned are twenty-eight in number, twelve of which relate to rulings upon evidence. The first two relate to the admission of evidence as to what took place between the plaintiff and defendant prior to the divorce in May, 1893. The defendant objected to this evidence because the plaintiff was then a married woman. If this evidence had been offered and admitted to prove a promise of marriage prior to the decree of divorce, as a basis of recovery, there would be force in the defendant's objection. Such a promise made while the woman, to the knowledge of both, is married, would be void. *Noice* v. *Brown*, 38 N. J. L. 228; *Paddock* v. *Robinson*, 63 Ill. 99. But the evidence was not admitted for any such purpose, but for the purpose, merely, of showing the relations which existed between these parties prior to the divorce, as bearing upon the question whether a promise of marriage had been made after the divorce; and as showing the circumstances under which the plaintiff had rendered services to the defendant. Limited as it was in its effect in this way, we think the evidence was admissible. *Ray* v. *Smith*, 9 Gray, 141; *Hook* v. *George*, 108 Mass. 324.

The answer of the witness Alice Martin, which was objected to, was hearsay and inadmissible when given; but it is difficult to see how it can have harmed the defendant, under the circumstances, or how this point could avail him upon a new trial. The defendant himself testified that he had told this witness substantially what she said he had. The answer would have been clearly admissible in contradiction of the defendant after he had testified, as he did, to the value of this property, and upon a new trial would be admissible for a like purpose. Under these circumstances we think a new trial should not be granted on account of this ruling.

The plaintiff was permitted, against the defendant's objection, to offer evidence of her good character and reputation for chastity, in rebuttal. In his answer the defendant alleged that the plaintiff was a person of immoral character and habits and had been the keeper of a bed-house; and he introduced evidence in support of these allegations which directly attacked the reputation of the plaintiff for chastity. Under these circumstances the ruling was correct. In cases of this kind the character of the plaintiff for chastity, when attacked, can always be sustained by evidence of reputation. *Dent* v. *Pickens*, 34 W. Va. 240; *Sprague* v. *Craig*, 51 Ill. 288; *Jones* v. *Layman*, 123 Ind. 569; *Haymond* v. *Saucer*, 84 id. 3.

As to the other rulings upon evidence it is sufficient to say that most, if not all, of them are correct, and that even if some of them are not, a new trial should not be granted on account of them.

The defendant requested the court, in effect, to charge the jury that the decree of divorce obtained by the plaintiff in May, 1893, was, as to the defendant, void, on the ground that it had been obtained by fraud in the shape of false testimony given by the plaintiff. It is undoubtely true that a stranger to the record, who is prejudiced as to some pre-existing right by a judgment, may attack it collaterally on the ground that it was obtained by fraud. Freeman on Judgments (3d ed.), § 335; 1 Black on Judgments, § 260; *Michaels* v. *Post*, 21 Wall. 398, 426; *Kinnier* v. *Kinnier*, 45 N. Y. 535; *Ruger* v.

*Heckel,* 85 id. 483; *Baugh* v. *Baugh,* 37 Mich. 59; *Webster* v. *Webster,* 54 Iowa, 153. But the defendant is not such a stranger. No right of his was prejudiced by the judgment of divorce. His promise of marriage was made, according to his own testimony, some months after the divorce was granted. Even then, if it be conceded that there was any evidence at all tending to show that the divorce had been obtained by fraud, the defendant could not avail himself of it to collaterally attack the judgment, and his request to have the jury charged to that effect was properly refused.

Upon comparing the charge as given, with the other requests made, we think the court in substance complied with all those to which the defendant was properly entitled. These requests, in substance, related to the effect of insanity and want of sufficient mental capacity, upon the ability of the defendant to make a binding promise; to the effect of certain claimed insane delusions on his part; and to the conduct and character of the plaintiff which would justify the defendant in refusing to carry out his promise of marriage. The charge upon all these points was correct in law, was adapted to the case as it was presented to the jury, and was sufficient for their guidance in coming to their verdict, and this is enough. *Hartford* v. *Champion,* 58 Conn. 268, 276.

With reference to one part of the charge, however, we think the court erred, and that was in charging the jury, in effect, that if they found the issues for the plaintiff upon both counts, she was entitled to recover upon both. Whether, upon the undisputed evidence in the case, the plaintiff was entitled to recover anything at all on the first count, even if it had been the only count in the complaint, is a question which we deem it unnecessary to consider, and upon which we express no opinion; but under the circumstances she was certainly not entitled to recover upon both counts. The compensation which the plaintiff agreed to take for her services, was the performance of the promise of marriage. If that promise had been performed, her claim for services would have been fully satisfied and discharged. But the damages recovered for a breach of an agreement are the legal

equivalent of performance. Under the instructions of the court upon the second count, the plaintiff, in the verdict, got the legal equivalent of performance, namely, full damages for the breach of promise; and having thus in legal effect got what she agreed to take as full compensation for her services, she is not entitled to the value of those services, in addition. No request to charge upon this point appears to have been made, nor does it appear that the attention of the court was called to it in any way, and the failure to notice it doubtless occurred through inadvertence on the part of the court; but still, it was the duty of the court to charge the jury correctly upon this point, and the charge as given upon it was clearly erroneous.

This entitles the defendant to a new trial; but we do not think in this case that a new trial ought to be granted unconditionally, if the amount which the verdict gave the plaintiff under the first count can be separated from the amount given under the second count. Under the first count the plaintiff claimed to recover the amount stated in her bill of particulars, to wit, $1,817.12, with interest; and the jury were told that she was entitled to recover, under that count, such sum as they found her services to be reasonably worth, with interest thereon from the date of the breach of promise, to the date of the verdict. As the jury, under the charge of the court, may have given her upon the first count the full amount of her bill of particulars with interest, and could not legally have given her more, the damages to which she is entitled upon the second count, would be the amount of the verdict less the amount of the bill of particulars with interest, as aforesaid. The date claimed by the plaintiff for the breach of the promise of marriage, was the last day of November, 1893. Unless the plaintiff will remit, upon the record, from the sum awarded her by the verdict, a sum equal to the amount of her bill of particulars, with interest thereon from December 1st, 1893, to the date of the verdict, a new trial is granted.

In this opinion the other judges concurred, except AN-DREWS, C. J., who dissented.