# EDWARD B. GOMEAU *v.* WINIFRED M. GOMEAU
## (SC 15613)

Berdon, Norcott, Katz, Palmer and Peters, Js.

Argued June 3—officially released July 29, 1997

*Terry Donovan*, for the appellant (plaintiff).

*Peter M. Sipples*, with whom, on the brief, were *Patricia C. Farrell* and *Susan P. Geenty*, for the appellee (defendant).

*Opinion*

BERDON, J. The dispositive issue in this appeal is whether, in this action for the dissolution of a marriage, the trial court abused its discretion by refusing to permit the plaintiff to testify in rebuttal concerning certain financial transactions and assets about which counsel

for the defendant had cross-examined the plaintiff during the plaintiff's case-in-chief. We conclude that the trial court abused its discretion in refusing to allow the rebuttal evidence and, therefore, we reverse the judgment of the trial court with respect to the financial orders and the division of assets.

The following facts are relevant to this appeal. The plaintiff, Edward B. Gomeau, who was fifty-four years old at the time of the trial court's decision, is employed as the finance director for the town of Stratford, and earns a gross weekly income of $1435. The defendant, Winifred M. Gomeau, who was sixty years old at the time of the decision, is employed as a registered nurse, but is unable to work more than thirty hours a week because she suffers from arthritis, trigger finger and fascitis of the heel. She earns a gross weekly income of $647 for this part-time employment.

In 1995, the plaintiff brought an action for the dissolution of his marriage to the defendant. The issues before the trial court included alimony and the equitable division of the parties' assets. After a two day trial, the trial court issued a memorandum of decision, finding that there were no minor children of the marriage and that the marriage was irretrievably broken down. The trial court also ordered alimony and division of the marital property as follows: (1) the marital home was to be sold, the defendant was to receive the proceeds from the sale, and the plaintiff would be liable for 50 percent of the capital gains tax on the sale; (2) the plaintiff was to pay the defendant $300 per week as periodic alimony; (3) the defendant was to receive $800 monthly from the plaintiff's $1686 monthly pension benefit from his prior employment with the town of Weston; (4) the defendant was to receive 60 percent of the plaintiff's pension benefits due under the town of Stratford pension plan; (5) the plaintiff was to pay for all of his individual debts and the parties' joint debts amounting

to approximately $23,200; (6) the plaintiff was to maintain a life insurance policy in the amount of $300,000 naming the defendant as the sole beneficiary, irrevocable until her death; and (7) the plaintiff was to pay the defendant's attorney's fees in the amount of $4000.

During the course of cross-examination of the plaintiff in the plaintiff's case-in-chief, the defendant attacked his credibility by asking him a series of questions with respect to certain financial transactions and assets. Specifically, the defendant inquired into: (1) a deposit of $3489 into the checking account of the plaintiff's mother in June, 1995; (2) the receipt and deposit of $10,000 into the plaintiff's personal checking account; (3) the cashing of a life insurance policy in the amount of $8000; and (4) the existence of certain savings bonds that the plaintiff allegedly had omitted from his financial affidavit. The plaintiff was unable to answer these questions, repeatedly stating that he would have to review the records in order to respond adequately.[1] Subsequently, the plaintiff rested his case with the provision that he be able to produce documentation to respond to the questions asked on cross-examination.[2]

---

[1] For example, the following exchanges took place between defense counsel and the plaintiff:

"Q. Well, sir, where would you have gotten $1300 from? You testified that since August of 1995, the only source of monies to you is your job and now the $8000 from the life insurance policy.

"A. I'd have to go back and look at the deposits, I just don't recall that. . . .

"Q. Would you like to take the time to add up the deposits for the last year and see what they total? In fact, Mr. Gomeau, I did add up those figures. And it came to $16,724. Do you have any explanation as to how that could have happened?

"A. No, I don't. I'd have to go back and look at those deposits."

[2] The record reflects the following colloquy between plaintiff's counsel and the trial court:

"[Plaintiff's Counsel]: Excuse me, Your Honor. Your Honor, at the present time, other than the Saybrook Convalescent Home I don't have any further witnesses.

"The Court: You rest?

"[Plaintiff's Counsel]: Subject to bringing in a person from the Saybrook Convalescent Home tomorrow.

During the evening between the first and second days of trial, the plaintiff reviewed the relevant records and came to court the second day prepared to offer explanations. When the plaintiff sought to offer his testimony and certain supporting documents in his rebuttal case, the trial court refused to allow the testimony, repeatedly sustaining objections by the defendant that the evidence went beyond the scope of rebuttal testimony. The trial court also declined to grant the plaintiff's request to make an offer of proof. Following the trial, the court denied the plaintiff's written motion for reconsideration, which asked the court to reconsider its refusal to permit an offer of proof and also included the proposed offer of proof.[3]

"The Court: All the evidence in connection with his claimed liability, in other words, what he claims to be a liability.

"[Plaintiff's Counsel]: Yes, Your Honor.

"The Court: In other words, that he owes the convalescent home whatever the sum is.

"[Plaintiff's Counsel]: May I confer for one minute?

"The Court: Sure.

"[Plaintiff's Counsel]: Your Honor, the only other thing we would ask is there might be a chance that my client can find some answers looking overnight in his paperwork to a couple of the questions that [defense counsel] raised. And if he could find the paperwork—

"The Court: Well, if he can find the paperwork, he can give it to her. And he's going to produce the bonds.

"[Plaintiff's Counsel]: Yes.

"The Court: Other than that, you rest?

"[Plaintiff's Counsel]: Yes, Your Honor.

"The Court: Plaintiff rests."

[3] Specifically, the plaintiff's proposed offer of proof, without the attachments, provides in relevant part:

"Had he been allowed to testify at trial on the second day of trial, as a continuation of his first day's testimony on redirect examination, the plaintiff would have testified to the following:

"1. That on the evening after the first day of trial, the plaintiff was able to examine his banking records and other records with respect to his joint checking account with his mother, in an attempt to explain why, in 1995, deposits of approximately $16,000 were made into said account, when his mother's social security checks totaled only $11,000; and to explain, specifically, a $3489 deposit into said account in June, 1995.

"A memorandum previously written by the plaintiff . . . and rediscovered by the plaintiff on said evening reminded him that in 1995, he had used his mother's checking account for purposes of a testimonial party given by his coworkers and him on the occasion of the retirement of a coworker, Dorothy Brown. The plaintiff was in charge of the finances for the testimonial. Since he was not allowed to use any checking account of the town of Stratford, for which he worked, for purposes of the testimonial, he offered the use of his mother's checking account as a means of depositing testimonial contributions and paying for the costs of the testimonial. Said memorandum was sent by him to his coworkers on July 3, 1995, reporting that $3784 had been received, and $3784 had been spent for purposes of the testimonial. Attached to the memorandum was a sheet delineating all of the testimonial expenditures . . . . He also found a list of all the contributors to the testimonial and the amounts of cash and check which each contributed, and the deposit slip and transaction receipt for these deposits into this account . . . . Finally, he found the cancelled checks with which the testimonial expenses were paid, namely, a $2156 check to the country club where the testimonial dinner took place, $1350 to pay for the testimonial gift (a computer), which was charged on the plaintiff's bankcard; and $77.41 and $35.77 to reimburse two other coworkers for items purchased for the testimonial . . . .

"The plaintiff also found handwritten notes from the parties' son, Ed, to his father, asking his father to deposit checks for him . . . . This reminded the plaintiff that he had allowed Ed, Jr., to use the plaintiff's mother's joint checking account with the plaintiff in order to deposit monies earned by Ed, Jr., while he was home from graduate school in Boston and working in the Old Saybrook vicinity in the winter and spring of 1995. The plaintiff found six cancelled checks with which he had withdrawn monies of his son's to give to his son or to pay bills on behalf of his son . . . .

"In addition to oral testimony explaining the above, the plaintiff would have offered to introduce the items marked as Schedules A through F into evidence as full exhibits.

"2. That on the evening after the first day of trial, the plaintiff was able to examine his records concerning a $10,000 loan taken out by him from the Stratford Municipal Federal Credit Union in 1995, in an attempt to explain that the loan proceeds from a loan taken out in April, 1995, were the same $10,000 as were deposited into his personal checking account [in] September, 1995; and to show the term of the loan and the precise manner in which the proceeds of the loan were spent.

"The plaintiff found a document from the Stratford Municipal Federal Credit Union showing that the $10,000 check was not received by him until July 17, 1995 . . . not in April, 1995, as the defendant's attorney had indicated. When able to closely examine the checking account statement showed him by the defendant's attorney on cross-examination, he saw that the $10,000 was deposited on September 15, 1995, not in October, 1995, as the defendant's attorney had indicated . . . . He found a copy of his loan

On appeal,[4] the plaintiff argues that the trial court:
(1) abused its discretion in making the financial orders;
(2) improperly assigned to the defendant 60 percent of
the plaintiff's pension from the town of Stratford
because it had not vested at the time of judgment; (3)
abused its discretion in ordering that the plaintiff report

document showing that the loan was a five year loan . . . . He found a cancelled check made out on September 15, 1995, to Catholic University, for the tuition of the daughter of the parties, in the amount of $5611 . . . and a check made out on September 10, 1995, to the Tax Collector—Town of Old Saybrook, for real property taxes on the marital home, in the amount of $1698.82 . . . . He also found a cancelled check for $1575, with which he paid the three months rent required as a deposit for the apartment he moved to in November 1, 1995, belonging to Marc Evans and Chris Taylor . . . .

"In addition to giving oral testimony to this effect, the plaintiff would have introduced into evidence the items marked as Schedules G through K as full exhibits.

"3. That on the evening after the first day of trial, the plaintiff was able to look for any family bonds in his possession, in an attempt to explain why his financial affidavit indicated that he had no bonds. Of the bonds which he possesses, none are in his name alone, many are in his children's sole names; two are his children's bonds, but are in their names in conjunction with the defendant's, and total fifty dollars . . . twenty-seven are his mother's bonds, purchased by her in the 1960s, bearing her name in conjunction with the plaintiff's, and totalling only $675 . . . and two are in the name of Winifred Gomeau, the defendant, or Edward Gomeau, the plaintiff, totalling $75 . . . .

"4. That on the evening of the first day of trial, the plaintiff was able to examine his records with respect to his income tax filing status, in an attempt to show that he does claim one exemption, namely, himself. He found that he does claim one exemption, and for that reason, federal withholding of $328.25 per week is deducted from his gross weekly earnings . . . .

"5. That on the evening of the first day of trial, the plaintiff was able to examine his records in an attempt to show how he spent the $8000 he received in 1996 when he cashed in his whole life insurance policy. He found a cancelled check for $4463.87, with which he paid one current mortgage payment and two delinquent mortgage payments for the marital home in April, 1996; he also found the receipt for said payment . . . . He found a cancelled check in the amount of $1748.30, with which he paid the delinquent real property tax on the marital home, and the bill and receipt therefor . . . ."

[4] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

and pay taxes on 50 percent of the gain from the sale of the marital property, even though he would receive no proceeds from the sale; (4) abused its discretion in ordering the plaintiff to maintain a life insurance policy in the amount of $300,000 with the defendant as the sole and irrevocable beneficiary; (5) incorrectly found that there was a ten year, rather than a six year, difference in age between the parties, which finding affected the court's financial orders; and (6) abused its discretion in refusing to allow the plaintiff to testify in rebuttal regarding certain financial transactions and assets about which he had been questioned during cross-examination. Because it is dispositive of the appeal, we reach only the plaintiff's sixth claim. We reverse the judgment of the trial court with respect to the financial orders and the division of assets and remand the case for further proceedings.

The plaintiff argues that the trial court improperly refused to allow him to testify in rebuttal in order to explain certain financial transactions and assets about which he had been questioned during cross-examination. In response, the defendant asserts that the trial court did not abuse its discretion because the testimony was beyond the scope of proper rebuttal testimony. We agree with the plaintiff.

It is well settled that the admission of rebuttal evidence lies within the sound discretion of the trial court. *Shaham* v. *Capparelli*, 219 Conn. 133, 134, 591 A.2d 1269 (1991); *State* v. *Simino*, 200 Conn. 113, 123, 509 A.2d 1039 (1986). "Ideally, rebuttal evidence is that which refutes the evidence [already] presented . . . rather than that which merely bolsters one's case." (Internal quotation marks omitted.) *State* v. *Wood*, 208 Conn. 125, 139, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988). This court has "recognized that rehabilitation of the credibility of a witness who has been subject to impeachment is an

appropriate purpose for rebuttal testimony." *Shaham* v. *Capparelli*, supra, 138 (*Shea, J.,* dissenting); see *Smirnoff* v. *McNerney*, 112 Conn. 421, 423, 152 A. 399 (1930); *Smith* v. *Hall*, 69 Conn. 651, 665, 38 A. 386 (1897). "The issue on appeal is not whether any one of us, sitting as the trial court, would have permitted the disputed testimony to be introduced. The question is rather whether the trial court . . . abused its discretion in not allowing the rebuttal testimony . . . ." *Shaham* v. *Capparelli*, supra, 134; see *Hall* v. *Burns*, 213 Conn. 446, 451, 569 A.2d 10 (1990).

Although we recognize that the trial court is vested with considerable discretion in controlling the mode and order of interrogating witnesses, we conclude that the court abused its discretion in refusing to allow the plaintiff to present rebuttal evidence concerning the financial transactions and assets in question. It is true that, ideally, the plaintiff should have sought to explain the transactions and assets during redirect examination by his attorney. He did not, however, have in his possession the documentation necessary to refresh his recollection. The plaintiff repeatedly stated that he would need to review the documentation in order to respond to defense counsel's questions. Our reading of the record reflects that defense counsel acquiesced in this proposed procedure.[5] Furthermore, the plaintiff rested his

[5] For example, the following colloquy took place:

"[Defense Counsel]: When we appeared in court in the spring of 1995, did you put on your financial affidavit that you had that $10,000?

"[The Plaintiff]: I don't recall at the time.

"[Defense Counsel]: In fact, you didn't, did you?

"[The Plaintiff]: I may not have listed it, no. Either the liability or asset. I don't remember.

"[Defense Counsel]: *Would you be willing to provide to me tomorrow morning your bank statements from March of 1995 through August of 1995?* The subpoenaed records begin in August of 1995.

"[The Plaintiff]: What's the month again?

"The Court: March through August of 1995.

"[The Plaintiff]: I don't think I opened that account at that point. I have to check and see when I opened that account. I think I still had the joint

case with the provision that he would search his records at home that evening in order to present the documentation to the court.

Nevertheless, the next day the trial court refused to allow the plaintiff to explain the transactions and assets at issue. The trial court also refused to allow an offer of proof. The documentation offered by the plaintiff, which the trial court had before it as part of the plaintiff's proposed offer of proof following the trial, would have been offered to explain the validity of each of the transactions and, if accurate, to reflect that he was not concealing assets.[6]

Furthermore, the record as a whole demonstrates that the plaintiff was prejudiced by the trial court's refusal to admit the rebuttal evidence. During cross-examination of the plaintiff, for example, defense counsel confronted him with the fact that, although his mother's annual income was $10,920, the sum of $16,724 nevertheless had been deposited into an account she held jointly with the plaintiff—thus strongly suggesting that the plaintiff was concealing assets in his mother's account. Before the plaintiff had the opportunity to

---

account into the summer, I think, which my wife has all those checks at home and those statements.

"[Defense Counsel]: Now, when you put the $10,000 into the bank account in September, what did you use those monies for?

"[The Plaintiff]: I think I paid a tuition payment for my daughter Selina for about $5600 or $5800. I also paid some taxes to the town of Old Saybrook.

"[Defense Counsel]: You think you paid a tuition payment.

"[The Plaintiff]: I know I paid it. I just don't recall the exact time and the exact amount. But that's what was paid out of that, yes.

"[Defense Counsel]: Is it possible you paid the tuition payment prior to depositing the $10,000?

"[The Plaintiff]: I don't think so, no.

"[Defense Counsel]: Do you have a receipt for the tuition payment or a canceled check?

"[The Plaintiff]: A canceled check, yes.

"[Defense Counsel]: *And you could produce that tomorrow morning?*

"[The Plaintiff]: Yes." (Emphasis added.)

[6] See footnote 3 of this opinion.

review his records that evening, he was unable to provide an explanation for this deposit.

We conclude that the trial court improperly excluded the rebuttal evidence offered by the plaintiff. Because the effect of the exclusion of this evidence was to prevent the plaintiff from providing an explanation for the transactions and assets used to impeach his credibility, the rebuttal evidence should have been admitted. Without such evidence, the plaintiff's credibility before the trial court was severely undermined. Moreover, the plaintiff's proposed rebuttal evidence neither would have been cumulative in nature; see *Verrastro* v. *Middlesex Ins. Co.*, 207 Conn. 179, 187–88, 540 A.2d 693 (1988); nor would it have taken an undue amount of time in light of the fact that the trial lasted only two days and the plaintiff was prepared to testify and offer his documentary proof in rebuttal on the second day. See *State* v. *Greene*, 209 Conn. 458, 478, 551 A.2d 1231 (1988).

The judgment of the trial court is reversed in part and the case is remanded for further proceedings with respect to the financial orders and the division of assets.

In this opinion the other justices concurred.