# GERALYNN BOONE, EXECUTRIX (ESTATE OF MARY BOONE) *v.* BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., ET AL.
## (SC 20200)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Vertefeuille, Js.

*Syllabus*

The plaintiff, the executrix of the estate of the decedent, M, sought to recover damages from the defendants, alleging that a certain brand-name anticoagulant medication they had designed, manufactured or sold wrongfully caused M's death. The defendants had received approval from the United States Food and Drug Administration to market the medication, and, for some time, M took the medication without significant side effects. Several years later, M suffered a gastrointestinal bleed and subsequently died. The plaintiff alleged that the defendants negligently failed to give adequate warnings, directions, and instructions to guard against the risk of bleeding caused by the medication and to investigate the benefits of establishing a therapeutic range for its administration. The plaintiff also alleged that the medication was defectively designed due to the absence of a reversal agent. The trial court granted the defendants' motion for summary judgment on the claim relating to the absence of a reversal agent, concluding, inter alia, that it was preempted by federal law. Thereafter, the plaintiff filed a request to charge, asking the court to instruct the jury that the defendants had improperly failed to maintain certain materials for the purpose of discovery, specifically, that they had lost or destroyed files of a former employee, L, while litigating prior federal actions relating to the medication, and that the jury could draw an adverse inference from the loss or destruction of such materials. At the conclusion of the trial, the court issued a spoliation instruction. The trial court also granted in part the defendants' motion in limine, seeking to exclude evidence, testimony, or argument regarding their failure to test reagrading a certain dose of the medication on the ground that a failure to test claim was preempted by federal law. The jury returned a verdict for the defendants, finding that, although the defendants negligently failed to give adequate warnings, directions, and

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

instructions to guard against the risk of bleeding caused by the medication, the plaintiff failed to prove that the defendants' conduct caused M's death. The trial court rendered judgment thereon for the defendants, from which the plaintiff appealed. *Held*:

1. The trial court did not abuse its discretion in excluding evidence and arguments relating to the issue of spoliation, as the doctrine of induced error precluded the plaintiff from making that claim: the plaintiff represented during argument on her request to charge regarding the defendants' failure to maintain L's files that the requested instruction would obviate the need to introduce evidence relating to spoliation and that the instruction itself, together with evidence introduced at trial relating to L's involvment in the development of the medication, would adequately provide the jury with the information it would need to draw an adverse inference against the defendants; accordingly, the plaintiff having had the opportunity to introduce evidence relating to L's involvement in developing the medication, having asked the court to give the requested spoliation instruction, and the court having done so in reliance on the plaintiff's representations, the plaintiff could not prevail on the ground that opening statements and evidence informing the jury about the defendants' loss or destruction of L's files was necessary to put the requested instruction in an appropriate context.

2. The trial court did not abuse its discretion in precluding the plaintiff from introducing, on rebuttal, an excerpt from the deposition of C, the defendants' senior vice president for clinical development; the court correctly concluded that the proffered excerpt was not proper rebuttal because C was not discussing a situation in which a person's gastrointestinal bleed had resolved prior to his or her death but, rather, was discussing only that a gastrointestinal bleed can indirectly lead to death, and such a broad statement did not contradict the more precise testimony of the defendants' experts that M's death was caused by other medical conditions rather than M's gastrointestinal bleed, which had resolved more than two weeks before M's death.

3. The trial court properly granted the defendants' motion for summary judgment on the plaintiff's claim relating to the defendants' failure to market a reversal agent for its medication, as the plaintiff's claim was preempted by federal law: five years after the medication was approved by the Food and Drug Administration, and after M's death, the defendants obtained approval to market a chemical reversal agent for the medication, and, in order to have cured the design defect alleged by the plaintiff, the defendants would have had to bring the reversal agent to market before M's gastrointestinal bleed, and, because there was no dispute that the reversal agent was not approved by the Food and Drug Administration until after the incident that gave rise to the plaintiff's design defect claim, the defendants could not have satisfied their alleged state law duty to M without marketing an unapproved drug in violation of federal law; moreover, the plaintiff's assertion that it was technologically

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

feasible to develop the reversal agent before M's death was insufficient to preclude preemption, as that fact was inapposite to the issue of whether marketing the reversal agent prior to M's gastrointestinal bleed would have required the Food and Drug Adminitration's special permission and assistance, and the possibility that that agency would have looked favorably on an earlier application for approval of the reversal agent did not alter the fact that, at the time of M's death, the defendants were precluded from marketing the reversal agent under federal law.

4. The trial court did not commit reversible error when it issued a curative instruction to the jury after closing arguments that it could not hold the defendants liable for failing to conduct tests regarding a particular dose of the medication that were described in a particular exhibit; contrary to the plaintiff's claim, the defendants did not open the door to the plaintiff's use of that exhibit during closing argument, the trial court's instruction merely precluded the jury from considering a single exhibit to support a particular claim that the court had determined was preempted by federal law, and the plaintiff was not unfairly prejudiced, as the trial court's curative instruction was brief, contained no explicit reprimand, and was conveyed to the jury with reasonably measured language.

Argued December 19, 2019—officially released May 4, 2020*

*Procedural History*

Action to recover damages for personal injuries sustained as a result of an allegedly defective product designed, manufactured or sold by the defendants, and for other relief, brought to the Superior Court in the judicial district of Hartford, Complex Litigation Docket, where the court, *Moll, J.*, granted in part the defendants' motions for summary judgment and rendered judgment thereon; thereafter, the case was tried to the jury; verdict and judgment for the defendants, from which the plaintiff appealed. *Affirmed.*

*Brenden P. Leydon*, with whom were *Neal L. Moskow* and *Kelly A. Koehler*, pro hac vice, and, on the brief, *Richard I. Nemeroff*, pro hac vice, for the appellant (plaintiff).

* May 4, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

*Paul W. Schmidt*, pro hac vice, with whom were *Patrick M. Fahey*, *Gregory Halperin* and *Michael X. Imbroscio*, pro hac vice, and, on the brief, *Phyllis A. Jones*, pro hac vice, for the appellees (defendants).

*Opinion*

KAHN, J. The plaintiff, Geralynn Boone, the executrix of the estate of Mary Boone (decedent), brought the present action against the defendants, Boehringer Ingelheim Pharmaceuticals, Inc., and Boehringer Ingelheim International, GmbH, alleging, inter alia, that an oral anticoagulant medication, Pradaxa, wrongfully caused the decedent's death. A jury returned a verdict in favor of the defendants, from which the plaintiff now appeals.[1] The plaintiff claims that the trial court improperly (1) precluded evidence and arguments related to spoliation, (2) prevented the plaintiff from using an excerpt from a particular deposition on rebuttal, (3) granted the defendants' motion for summary judgment on a design defect claim relating to the absence of a reversal agent, and (4) issued a curative instruction to the jury after closing arguments. We disagree with each of these claims and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to the present appeal. After experiencing intermittent heart palpitations in 2003, the decedent was diagnosed with nonvalvular atrial fibrillation. That condition may cause the formation of blood clots and, as a result, substantially increased the decedent's risk of suffering an ischemic stroke. In order to reduce that risk, Jeffrey Fierstein, a cardiologist, prescribed an anticoagulant named warfarin to the decedent. The use of warfarin requires dietary restrictions, frequent blood

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

testing, and dose titration to keep the concentration of medication present in the bloodstream within an accepted therapeutic range. Like all anticoagulants, warfarin increases the risk of uncontrolled bleeding.[2]

In October, 2010, the defendants received approval from the United States Food and Drug Administration (FDA) to begin selling dabigatran etexilate, an anticoagulant marketed under the brand name Pradaxa. Unlike warfarin, Pradaxa requires no dietary restrictions and was approved for use without blood monitoring or dose titration. In November, 2010, Fierstein met with the decedent and recommended switching from warfarin to Pradaxa. Fierstein testified at trial that the decedent had been tolerating warfarin well and that he had recommended the switch "out of convenience." The decedent agreed and, for some time, took Pradaxa without any significant side effects.

On March 5, 2014, the decedent suffered a severe gastrointestinal bleed and was admitted to a hospital. The decedent underwent kidney dialysis to remove Pradaxa from her blood and was administered multiple blood transfusions. Although the bleeding stopped three days later, the decedent's kidneys began to fail. On March 25, 2014, the decedent died. The death certificate lists "[a]cute [k]idney [i]njury," "chronic kidney [d]isease," "[r]etroperitoneal [f]ibrosis," and "occult neoplasia" as causes of death.[3] The death certificate also lists "[d]abi-

---

[2] Stanley Schneller, a cardiologist, testified at trial that "below [the accepted therapeutic] range [patients] don't get any benefit, it's as if they're not taking the drug, and above that range [patients] get no further benefit in terms of stroke prevention." Thus, Schneller testified, the "targeted range is designed to give [patients] stroke protection without undue bleeding risk." Fierstein testified that the decedent was inside of the accepted therapeutic range "at least 75 percent of the time" she was taking warfarin.

[3] According to testimony offered at trial, retroperitoneal fibrosis is a medical condition that can cause kidney damage by obstructing the flow of urine. This condition was not related to the decedent's use of Pradaxa. The phrase "occult neoplasia" denoted an undiagnosed cancer.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

gatran [i]nduced [c]oagulopathy'' and ''gastrointestinal bleed'' as ''significant'' conditions contributing to the decedent's death. (Emphasis omitted.) No autopsy was performed.

The plaintiff subsequently commenced the present action, alleging, inter alia, that (1) the defendants negligently failed to give adequate warnings, directions, and instructions to guard against the risk of bleeding caused by Pradaxa, (2) the defendants negligently failed to test, study, and investigate the benefits of establishing a therapeutic range for Pradaxa, and (3) Pradaxa was defectively designed due to the absence of a reversal agent. On January 24, 2018, the trial court granted the defendants' motion for summary judgment on the claim relating to the absence of a reversal agent, concluding, among other things, that it was preempted by federal law.[4]

The plaintiff filed a pretrial motion asking the trial court to instruct the jury that the defendants had improperly failed to maintain certain relevant materials for the purpose of discovery. Specifically, the plaintiff claimed that the defendants had lost or destroyed files of one of its former employees, Dr. Thorsten Lehr, while litigating previous federal actions relating to Pradaxa. The trial court, applying the test set forth in *Beers* v. *Bayliner Marine Corp.*, 236 Conn. 769, 777–79, 675 A.2d 829 (1996), concluded that a spoliation instruction was warranted and, over the defendants' objection, provided such an instruction to the jury at the end of the trial. See footnote 6 of this opinion.

The jury returned a verdict, finding that, although the defendants had negligently failed to give adequate warnings, directions, and instructions to guard against

---

[4] The judgment file incorrectly notes that the defendants' various motions for summary judgment were denied in their entirety. This appears to have been a scrivener's error.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

the risk of bleeding caused by Pradaxa, the plaintiff had failed to prove that the defendants' wrongful conduct caused the decedent's death. The trial court subsequently rendered judgment in favor of the defendants, from which the plaintiff appealed. Additional facts and procedural history will be set forth as necessary.

I

The plaintiff first claims that the trial court improperly precluded certain evidence and arguments related to the issue of spoliation.[5] Specifically, the plaintiff posits that the absence of such information deprived the jury of the context necessary to decide whether to draw an adverse inference against the defendants, as permitted by the trial court's spoliation instruction. In response, the defendants argue that the trial court's limitations in this regard were proper.[6] For the reasons

[5] The plaintiff also makes the conclusory assertion that the trial court's rulings with respect to spoliation "would seem to violate basic notions of fundamental fairness, due process, and the right to counsel." The plaintiff's brief, however, contains no analysis applying those constitutional principles to the facts of the present case. As a result, we deem those claims, insofar as they were raised, to have been abandoned. *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 124, 956 A.2d 1145 (2008) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." [Internal quotation marks omitted.]).

[6] The defendants argue that the trial court's decision to give a spoliation an instruction was, itself, improper. Because the defendants prevailed at trial, we decline to address that claim of error in the present appeal. See Practice Book § 61-1; see also *Seymour* v. *Seymour*, 262 Conn. 107, 110, 809 A.2d 1114 (2002) ("[o]rdinarily, a party that prevails in the trial court is not aggrieved"). We note, however, that other trial courts overseeing Pradaxa trials in this state have adopted divergent approaches to this issue. See *Bedsole* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, Superior Court, judicial district of Hartford, Docket No. CV-16-6070289-S (September 14, 2018) (68 Conn. L. Rptr. 206) (declining to provide adverse inference instruction); *Gallam* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, Superior Court, judicial district of Hartford, Docket No. CV-16-6067874-S (April 13, 2018) (following trial court's approach in present case, but also giving spoliation instruction during presentation of evidence); see also *In re Petition of*

554 NOVEMBER, 2020 335 Conn. 547

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

that follow, we decline to conclude that the trial court abused its discretion by precluding evidence and arguments relating to the issue of spoliation in the present case.

The following additional facts and procedural history are relevant to our consideration of this claim. In 2012, certain federal litigation relating to Pradaxa was centralized in the Southern District of Illinois pursuant to 28 U.S.C. § 1407, and a federal district court judge, David R. Herndon, was appointed to preside. *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, 883 F. Supp. 2d 1355, 1355–56 (J.P.M.L. 2012). Various discovery disputes in that consolidated federal litigation led to motions seeking sanctions against the defendants. See *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, Docket No. 3:12-MD-02385 (DRH), 2013 WL 6486921, *1 (S.D. Ill. December 9, 2013).

As a result of those disputes, on September 18, 2013, Judge Herndon issued a mandatory injunction requiring the defendants to conduct "an immediate search for any yet undisclosed materials . . . ." (Internal quotation marks omitted.) Id., *3–5. During a subsequent deposition, the plaintiffs in that proceeding discovered that Lehr was a potentially relevant source of additional information and, as a result, requested production of his custodial file. Id., *9. Approximately one month after that deposition, the defendants informed Judge Herndon that Lehr had not been identified as a custodian and that, as a result, some of his documents and files had been destroyed. Id.

In reviewing a subsequent motion for sanctions, Judge Herndon found that Lehr "was a prominent scientist . . . that played a vital role in researching Pradaxa," that the defendants were familiar with his work,

*Boehringer Ingelheim Pharmaceuticals, Inc.*, 745 F.3d 216, 220 (7th Cir. 2014) (noting wide range of sanctions available to district court).

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

and that the evidence on record in that case would
"lead a reasonable person to infer a motive for the
defendant[s] to abstain from placing a litigation hold
on [Lehr's] materials . . . ." Id., *12. On the basis of
these findings, the court concluded that the defendants
had failed to maintain Lehr's files "in bad faith."[7] Id.,
*18. This conduct, together with certain other discovery
violations, led Judge Herndon to impose immediate sanc-
tions on the defendants, including a substantial mone-
tary fine and an order compelling the attendance of vari-
ous corporate employees at depositions in the United
States. Id., *20. In a separate ruling, Judge Herndon also
specifically put the defendants on notice that additional
sanctions, including an adverse inference instruction,
would be considered at the close of discovery and
would "apply to any actions pending before [that] court
at [that] time . . . ." *In re Pradaxa (Dabigatran Etexi-
late) Products Liability Litigation*, United States Dis-
trict Court, Docket No. 3:12-MD-02385 (DRH), MDL No.
2385, CMO 50-1 (S.D. Ill. December 18, 2013), available
at https://www.ilsd.uscourts.gov/Documents/mdl2385/
cmo50-1.pdf (last visited May 1, 2020). The defendants
challenged Judge Herndon's order by filing a petition
for a writ of mandamus in the United States Court of
Appeals for the Seventh Circuit. *In re Petition of Boeh-
ringer Ingelheim Pharmaceuticals, Inc.*, 745 F.3d 216–
17 (7th Cir. 2014). In that proceeding, the Seventh Cir-

---

[7] Prior to 2015, there was a split in federal courts regarding the factual
findings necessary to support an imposition of sanctions, such as an adverse
inference instruction, for the spoliation of electronically stored information;
some courts imposed sanctions on a finding a gross negligence, while others
required intentional destruction. Compare *Residential Funding Corp.* v.
*DeGeorge Financial Corp.*, 306 F.3d 99, 99–101 (2d Cir. 2002) (gross negli-
gence standard), and *Bracey* v. *Grondin*, 712 F.3d 1012, 1020 (7th Cir. 2013)
(bad faith standard). The Federal Rules of Civil Procedure were ultimately
amended in 2015 to require a finding of bad faith. See Fed. R. Civ. P. 37 (e)
(2) (permitting imposition of sanctions "only upon finding that the party
acted with the intent to deprive another party of the information's use in
the litigation").

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

cuit concluded that the order compelling the deposition of corporate employees in the United States was improper. Id., 219–20. In reaching this conclusion, the Seventh Circuit expressly declined to revisit the factual findings underlying the District Court's finding of bad faith and its imposition of other sanctions. Id., 218. Following Judge Herndon's decision, the consolidated federal litigation settled. See *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, United States District Court, Docket No. 3:12-MD-02385 (DRH) (S.D. Ill. May 1, 2015), available at https://www.ilsd.uscourts .gov/documents/mdl2385/MinuteOrder656.pdf (last visited May 1, 2020).

Notwithstanding the resolution of the consolidated federal litigation, several cases related to Pradaxa remained pending in this state. Those cases were placed onto a single, consolidated docket governed by a series of case management orders. See *In re Connecticut Pradaxa Litigation*, judicial district of Hartford, Complex Litigation Docket, Docket No. HHD-CV-13-5036974S. The trial court in the present case noted that, under one such order dated July 23, 2015, "all discovery propounded and completed in the [consolidated federal litigation was] deemed propounded and responded to for purposes of [Connecticut's consolidated Pradaxa litigation] docket . . . ." That order, which the parties agreed to be bound by, required the defendants to provide the plaintiff with all evidence produced during the course of the consolidated federal litigation, and provided that all discovery requests and responses in that proceeding "shall be deem[ed] served in this court for purposes of the parties' respective rights and obligations with regard thereto."

On January 5, 2018, the plaintiff filed a pretrial request to charge, requesting a spoliation charge relating to, among other things, the defendants' failure to maintain

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

Lehr's files.[8] Relying principally on Judge Herndon's finding of bad faith, the plaintiff requested an instruction indicating that the elements of spoliation had been met as a matter of law. The defendants objected, and the trial court heard oral argument on January 29, 2018. During oral argument, the plaintiff argued that the presentation of evidence relating to spoliation would be "time-consuming" and "extraordinarily difficult" to put in context.[9] The plaintiff indicated that such an endeavor would be an unnecessary "sideshow" that would waste both time and judicial resources. On several occasions, the plaintiff represented that she would not seek to introduce such evidence, if the court were to conclude, at the outset of the trial, that she was entitled to the requested instruction.[10]

The court then asked the plaintiff the following specific question: "[I]f the court granted the requested charge and you didn't put on any evidence of Judge Herndon's order, et cetera, how would the jury be equipped to determine whether to draw an adverse inference? As . . . you know, it's not mandatory." In response, the plaintiff stated that the instruction itself

---

[8] The plaintiff also requested instructions relating to the destruction of certain text messages and corporate e-mails. Those aspects of the plaintiff's request to charge are not at issue in the present appeal.

[9] The plaintiff noted, in particular, that such evidence would likely require calling one of the defendants' attorneys, Eric Hudson, as a witness.

[10] During oral argument, the plaintiff implied that the introduction of such evidence could be avoided at least three times. On one occasion, the plaintiff stated that, "if the court doesn't grant this motion, then [she] intend[s] to put on evidence that there was a prior proceeding in which [the defendants] were obligated to preserve this information and they failed to do so." On another occasion, the court asked the plaintiff the following question: "So your position is that if the court were to grant the request for a spoliation charge, you would not intend to put on any evidence of Judge Herndon's order?" The plaintiff responded by stating: "That's correct." Finally, the plaintiff concluded her argument on as follows: "We believe that the motion should be granted for the reasons we've articulated, but if the court denies it, we'd ask that it be denied with direction that we be permitted to put on the evidence as we've discussed here today."

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

would inform the jury of her claim that the defendants
had "intentionally . . . or recklessly lost or destroyed"
documents, including files from Lehr, that were relevant
"to the issues of the benefits of assessing and adjusting
Pradaxa dosing based on blood concentrations . . . ."
The plaintiff asserted that, armed with such an instruc-
tion and testimony from various witnesses discussing
Lehr, the jury "would be able to put [the spoliation
issue] in context."[11]

On February 18, 2018, in a comprehensive, written
decision,[12] the trial court granted the plaintiff's request
for a spoliation charge, finding that, in light of the pro-
ceedings before Judge Herndon, the plaintiff had satis-
fied the elements of spoliation set forth in *Beers* as a
matter of law and was entitled to a jury instruction to
that effect.[13] In so doing, the court noted: "The parties
agreed to be bound by, and not duplicate, the discovery
process that had occurred in the [consolidated federal
litigation]. It necessarily follows that an offending party
who failed to identify a custodian of potentially relevant
evidence and who failed to preserve such evidence in
the underlying proceeding should also be bound by any
judicial findings by the underlying court relating to such
discovery failures. The contention that Judge Herndon's
discovery related findings should be ignored altogether
smacks of unfairness under the very unusual circum-
stances of the discovery process in [Connecticut's con-

---

[11] During a supplemental oral argument before the trial court, the plaintiff
repeated her belief that the jury could be provided with an adequate context
through evidence regarding Lehr's involvement in the research underlying
Pradaxa and, specifically, the concept of a therapeutic range.

[12] The trial court's written decision summarized the proceedings related
to spoliation sanctions before Judge Herndon, including the relevant factual
findings and conclusions.

[13] As noted subsequently in this opinion, the ultimate question of whether
to draw an adverse inference was reserved for the jury. See, e.g., *Paylan*
v. *St. Mary's Hospital Corp.*, 118 Conn. App. 258, 264, 983 A.2d 56 (2009);
see also Connecticut Civil Jury Instructions (2012) § 2.3-4, available at https://
jud.ct.gov/JI/Civil/Civil.pdf (last visited May 1, 2020).

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

solidated Pradaxa litigation] docket.'' The court then
concluded that the ''relitigation of the spoliation issues
relating to . . . Lehr . . . would . . . offend princi-
ples of judicial economy, would create a trial within a
trial, would risk one or more trial counsel being called
as witnesses, and would create possible, if not inevita-
ble, confusion with the jury, who would be presented
with testimony and other evidence (e.g., court orders,
among other things) relating to the [consolidated fed-
eral litigation].'' See footnote 6 of this opinion.

The following day, the trial court granted a motion
in limine filed by the defendants seeking to exclude
'' 'evidence, testimony, or argument regarding alleged
spoliation issues' '' relating to Lehr.[14] The trial court
based its decision on the plaintiff's previous representa-
tions that such issues would not need to be presented
to the jury if the court granted, as it did, her request
for a spoliation charge.

On February 23, 2018, the plaintiff filed a motion
asking the court to issue the instruction on spoliation
at the commencement of trial. In that motion, the plain-
tiff also sought permission to ''inform the jury during
opening, at trial, and during closing argument of [the
defendants'] unlawful destruction of critically impor-
tant evidence . . . .'' On that same day, the defendants
objected, and the trial court heard oral argument. The
court ruled that references to spoliation during opening
statements risked unfair prejudice to the defendants
and, accordingly, exercised its discretion to proscribe

[14] The plaintiff's written objection to the defendant's motion in limine
reiterated her position that she would seek to introduce evidence relating
to spoliation only in the event the trial court declined to give the requested
instruction. The plaintiff argued, specifically, that ''in the event that the
spoliation issues addressed by Judge Herndon's orders are to be relitigated
in this case, then [the] plaintiff believes that the court should admit as full
exhibits [the various court orders] reflecting Judge Herndon's identification
of the discovery orders, [the] bad faith conduct in breaching same, and the
consequences of that conduct.''

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

such references. See Practice Book § 15-6. The trial
court also made clear that, although the plaintiff was
free to discuss Lehr's importance to the case generally,
information relating to the "destruction" of documents
could not be communicated to the jury during the evi-
dentiary portion of the trial in the absence of a witness
with personal knowledge of that event.[15] The trial court
noted that the sanction the plaintiff had procured was
powerful. The court was particularly concerned about
the use by the plaintiff's counsel of the terms "sanction"
or "bad faith" because, "although [it] found as a matter
of law that Judge Herndon's findings satisfies *Beers*, he
made findings that go beyond *Beers* and so he made a
bad faith finding that is not necessary under *Beers*."
(Internal quotation marks omitted.) Finally, the trial
court expressly reserved decision on whether argu-
ments relating to spoliation would be permitted in clos-
ing, noting that it had not yet determined whether it
would give the adverse inference instruction when evi-
dence relating to Lehr was admitted during trial, or
after closing arguments.

Lehr's involvement in the development of Pradaxa
featured prominently at trial. In his opening statement,
the plaintiff's counsel told the jury that the defendants
had an interest in suppressing scientific information
showing a "therapeutic range" for Pradaxa because fre-
quent blood testing would place that product at a com-
petitive disadvantage. The plaintiff's counsel noted, in
particular, that the defendants had pressured one of
their own scientists, Paul Reilly, to remove such infor-

---

[15] Although conceding that the scheduled witnesses lacked such personal
knowledge, the plaintiff did indicate to the trial court that a particular
corporate e-mail had identified Lehr as the "father" of a manuscript relating
to dabigatran etexilate exposure, and that expert witnesses who had
reviewed the materials produced by the defendants could testify that they
had been unable to locate any version of that manuscript authored by Lehr.
As discussed subsequently in this opinion, testimony to this effect was, in
fact, ultimately presented to the jury.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

mation from a manuscript relating to dabigatran etexilate exposure. The plaintiff's counsel indicated that certain corporate documents had identified Lehr as the "father" of that same manuscript and that Reilly had simply continued Lehr's work.[16] The plaintiff's counsel then urged the jury to "pay close attention to the paper and how it developed."[17]

One of the plaintiff's expert witnesses, a pharmacologist named Laura Plunkett, opined during her testimony that blood monitoring should have been required for Pradaxa because, like warfarin, Pradaxa has a particular therapeutic range that balances the various risks posed by clots and bleeds. She based her opinion, in part, on information contained in Reilly's exposure response paper. Plunkett then testified that she had reviewed various communications about the exposure response paper and that, in her opinion, important scientific information demonstrating a specific therapeutic range had been suppressed by the defendants in order to avoid the need for blood monitoring.[18] Finally, Plunkett testified, over the defendants' objection, that she had

_____

[16] The published version of that paper, which was admitted into evidence as a full exhibit, lists both Reilly and Lehr as authors, and indicates that both Reilly and Lehr "contributed equally."

[17] The plaintiff's opening statement was accompanied by various slides that were shown to the jury. One such slide read as follows: "We do not have the first version of the Pradaxa paper."

[18] In one e-mail, Reilly writes that, "I am aware that the conclusions that appear to emerge from this paper are not the ones currently wished for by marketing (that dose adjustment will optimize therapy) . . . ." In a separate string of e-mails discussing specific upper and lower blood concentration measurements, Reilly notes that he has "been facing heavy resistance internally on this paper about the concept of a therapeutic range, at least stating it outright." In certain other communications discussing the need for blood monitoring with Pradaxa in specific populations, Andreas Clemens, the head of the department of medical affairs for dabigatran etexilate, wrote as follows: "This needs [to be] a TelCon and we should NOT interact via e-mail on this." All of this correspondence was admitted into evidence and placed before the jury for consideration.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

looked for the first draft of the exposure response paper and had been unable to find that document.[19]

Our review of the record indicates that, over the course of the nearly three weeks of trial that followed, there was only one particular instance in which the plaintiff proffered, and the trial court excluded, testimony directly relating to the destruction of Lehr's files. On that occasion, the plaintiff sought to introduce an excerpt from a deposition of Andreas Barner, the defendants' chairman of corporate management, relating generally to his awareness of the defendants' failure to preserve Lehr's computer. The plaintiff argued that this excerpt would provide "bread crumbs" to assist the jury in determining whether to draw an adverse inference against the defendants. The trial court, however, precluded admission of that excerpt, concluding that the information fell "squarely within" its previous rulings related to spoliation and the adverse inference instruction.

On the final day of the plaintiff's case-in-chief, the defendants filed a motion seeking reconsideration of the court's previous decision to charge the jury on the issue of spoliation. In that motion, the defendants argued, inter alia, that the plaintiff's factual basis for requesting a spoliation charge had been undercut at trial. See footnote 19 of this opinion. The plaintiff objected, arguing that the evidence presented to the jury did not undermine the requested charge. The plaintiff further claimed that, even if evidence of spoliation was lacking, precluding the charge on that ground would be improper in light of the fact that the trial court had

_____

[19] The defendants sought to undercut this testimony on recross-examination by introducing a version of the exposure response paper that *Reilly* had characterized in an e-mail as the "first draft." Plunkett later testified that she had specifically attempted to locate an earlier version of that paper from *Lehr* in light of an e-mail that identified Lehr as the "father" of the manuscript.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

excluded evidence of spoliation during trial. The plaintiff noted that the trial court's "carefully tailored spoliation charge is an appropriate sanction for [the defendants'] wrongful conduct." The trial court denied the defendants' motion.[20]

The defendants subsequently called Reilly as a witness during their case-in-chief. During that testimony, Reilly described the defendants' efforts to evaluate blood concentration data, stating that the exposure response paper had "gone through . . . multiple iterations" and that Lehr had "initiated . . . dose titration modeling to see whether . . . he could identify a target range of dabigatran and a target dose adjustment." Reilly testified that, despite their best efforts, the defendants had not been able to identify a particular therapeutic range for Pradaxa and, had such a range been established, it would have been communicated to physicians. Reilly then indicated that the FDA and the scientific community had reached the same consensus.

On cross-examination, the plaintiff's counsel questioned Reilly about a specific e-mail in which Andreas Clemens, the head of the department of medical affairs for dabigatran etexilate, referred to Lehr as the "father" of the exposure response paper. (Internal quotation marks omitted.) That correspondence, which was admitted into evidence as a full exhibit, indicates that Reilly "took [that paper] over and changed it significantly." In response, Reilly testified that he was personally unaware of any drafts of the exposure response paper prior to his own and that Clemens had been "sadly

_____

[20] During oral argument on the defendants' motion for reconsideration, the plaintiff stated as follows: "[W]e wanted the record to be clear that [the] plaintiff has understood the court's instruction regarding the spoliation charge was that the plaintiff would not be offering evidence during the course of its case as to issues of spoliation or suppression of documents. . . . [T]o the extent that the court entertains the motion to [reconsider], we [do] not want to waive the right to put on such evidence by resting . . . ."

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

misinformed.'' See also footnotes 15 and 19 of this opinion.

Following the close of evidence, the plaintiff again requested permission to inform the jury during closing argument of the defendants' spoliation and the impact it had on the present case. Without such information, the plaintiff argued, the jury would lack the context necessary to draw the adverse inference invited by the court's instruction. The plaintiff, however, did not proffer the substance of the new or additional information relating to spoliation that she wanted to use in closing argument. Rather, she again referenced Lehr's general importance to the development of Pradaxa and his involvement with the exposure response paper. The trial court ruled that the issue of spoliation would not be ''fodder for closing argument'' but expressly noted that the parties were free to ''mention what [had] already come into evidence . . . .''

The plaintiff's closing argument, in fact, discussed the evidence relating to Lehr at length. Specifically, the plaintiff's counsel repeated the argument that the defendants had sought to suppress information relating to a therapeutic range for Pradaxa because blood monitoring would put their product at a competitive disadvantage. The plaintiff's counsel emphasized that the authors of the exposure response paper had explored the concept of blood monitoring, that Clemens' e-mail implied the existence of an early draft manuscript authored by Lehr, and that such a manuscript had never been discovered.[21] Finally, the plaintiff's counsel asked the jury to pay ''close attention'' to the trial court's instructions relating to Lehr and to ''be the judge'' of whether such facts were important.

_____

[21] In response, the defendants posited during their closing argument that Reilly's testimony, together with various documents and correspondence, had disproved the existence of such a draft.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

The trial court ultimately issued the following instruction to the jury relating to spoliation: "The plaintiff claims that certain evidence was not available to her because [the defendants] destroyed or failed to preserve it, at a time when it had a legal duty to preserve it. Specifically, [the defendants] destroyed or failed to preserve the desktop computer, laptop computer, Blackberry phone, and paper files of . . . Lehr, about whom there was some evidence during the trial, who was a scientist and employee of [the defendants and] who did research concerning Pradaxa until he left the company in September, 2012. The plaintiff contends such evidence is relevant to her claim concerning the benefits of assessing blood plasma concentrations. I instruct you that . . . Lehr's desktop computer, laptop computer, Blackberry phone, and paper files were not preserved at a time when [the defendants were] on notice of a legal duty to preserve them and that the failure to retain such files was intentional, in the sense that it was not inadvertent. Our law allows you to draw an adverse inference that the destroyed evidence would have been unfavorable to [the defendants]. You may therefore draw an inference that the evidence that was destroyed or not preserved would be unfavorable to [the defendants], but you are not required to do so. Understand that this is not a claim for which you would award damages; rather, it permits an adverse inference to be drawn as you consider all the evidence relating to the plaintiff's claims. If you choose to draw such an inference, you may not use the inference to supply the place of evidence of material facts or to shift the burden of proof from the plaintiff to [the defendants] on the plaintiff's claims, but it may turn the scale when the evidence is closely balanced. By giving you this instruction, the court does not mean to place emphasis on this issue versus any other aspect of the evidence that you may consider, and the court takes no view as to whether

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

such an inference should be drawn, as that decision is for you, the jury, to decide.''[22]

Following the jury's verdict in favor of the defendants, the plaintiff filed a motion to set aside the verdict, claiming, among other things, that the trial court had ''improperly prevented [her] from informing the jury of [the defendants'] acts of spoliation and the court's sanction regarding the same.'' The plaintiff argued that the issue of spoliation was itself relevant and probative to the defendants' reckless disregard for consumer safety. She renewed her claim that the trial court's restrictions on opening statements, the admission of evidence, and closing arguments prevented her from providing the jury with the context necessary to decide whether to draw an adverse inference against the defendants. The trial court found this claim to be ''wholly without merit'' because the plaintiff, in seeking an instruction, expressly represented that evidence relating to spoliation would not need to be presented at trial. Relying in part on the induced error doctrine, the trial court denied the motion, concluding that the plaintiff had found ''purported error in the very approach for which she successfully advocated.''

We begin by noting the standard of review and the general principles of law applicable to the plaintiff's claim. ''The trial court possesses inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial.'' (Internal quotation marks omitted.) *Downs* v. *Trias*, 306 Conn. 81, 102, 49 A.3d 180 (2012). We review the relevant rulings of the trial court in the present case for an abuse of that discretion. See, e.g., *McBurney* v. *Paquin*, 302 Conn.

---

[22] The plaintiff does not claim in the present appeal that the content of the trial court's ultimate instruction deviated in any material respect from her request.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

359, 378, 28 A.3d 272 (2011) (''[t]he trial court's ruling
on evidentiary matters will be overturned only upon a
showing of a clear abuse of the court's discretion'' (inter-
nal quotation marks omitted)); *Naughton* v. *Hager*, 29
Conn. App. 181, 188, 614 A.2d 852, (''[t]he trial court is
vested with broad discretion over the latitude of the
statements of counsel during argument''), cert. denied,
224 Conn. 920, 618 A.2d 527 (1992).[23] In applying that
standard, ''[w]e [must] make every reasonable presump-
tion in favor of upholding the trial court's ruling, and
only upset it for a manifest abuse of discretion. . . .
[Thus, our] review of such rulings is limited to the
questions of whether the trial court correctly applied
the law and reasonably could have reached the conclu-
sion that it did.'' (Internal quotation marks omitted.)
*Filippelli* v. *Saint Mary's Hospital*, 319 Conn. 113, 119,
124 A.3d 501 (2015).

We agree with the trial court's assessment that the
present case implicates the doctrine of induced error.
''[T]he term induced error, or invited error, has been
defined as [a]n error that a party cannot complain of
on appeal because the party, through conduct, encour-
aged or prompted the trial court to make the [allegedly]
erroneous ruling. . . . It is well established that a party
who induces an error cannot be heard to later complain
about that error. . . . This principle bars appellate
review of induced nonconstitutional error and induced

[23] The plaintiff argues that, in light of the trial court's decision to instruct
the jury on spoliation, its decision to ''preclude counsel from commenting
[on that issue] in any manner'' should be reviewed de novo. We disagree
for two reasons. First, as set forth previously in this opinion, the plaintiff
was permitted to introduce evidence regarding Lehr's research and his
involvement with the exposure response paper. Second, to the extent that
the plaintiff assails the scope of the remedy ultimately fashioned, we note
that the imposition of sanctions for discovery misconduct is also vested in
the sound discretion of the trial court. See, e.g., *Ridgaway* v. *Mount Vernon
Fire Ins. Co.*, 328 Conn. 60, 70, 176 A.3d 1167 (2018); *Duncan* v. *Mill Manage-
ment Co. of Greenwich, Inc.*, 308 Conn. 1, 28, 60 A.3d 222 (2013).

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

constitutional error. . . . The invited error doctrine rests [on principles] of fairness, both to the trial court and to the opposing party. . . . [W]hether we call it induced error, encouraged error, waiver, or abandonment, the result—that the . . . claim is unreviewable—is the same.'' (Internal quotation marks omitted.) *Independent Party of CT—State Central* v. *Merrill*, 330 Conn. 681, 724, 200 A.3d 1118 (2019); see also *State* v. *Fay*, 326 Conn. 742, 765 n.22, 167 A.3d 897 (2017) (''a finding of induced error is supportable when a party's claim on appeal will result in an inappropriate ambush of the trial court''). With these standards in mind, we turn to the trial court's rulings in the present case.

Our review of the record leads us to conclude that the doctrine of induced error precludes the plaintiff from claiming that the trial court improperly excluded opening statements and evidence relating to spoliation. In response to the plaintiff's pretrial request for an adverse inference instruction, the court specifically asked the plaintiff how the jury would be able to decide whether to draw such an inference without any evidence relating to the underlying conduct. The plaintiff not only represented to the trial court that the requested instruction would obviate the need for such evidence; see footnote 10 of this opinion; but also indicated that the instruction itself, together with evidence generally relating to Lehr's involvement in the development of Pradaxa, would adequately equip the jury with the information it would need to draw an adverse inference against the defendants.

The trial court afforded the plaintiff broad latitude to introduce evidence and testimony describing the nature of Lehr's work, his research regarding the possible existence of a therapeutic range, and the scope of his involvement in the exposure response paper. The plaintiff used the testimony proffered by Plunkett and Reilly, in particular, to develop a detailed theory that

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

Lehr had authored an early version of the exposure response paper that the defendants had never produced. The trial court's instruction clearly stated that the defendants had failed to preserve Lehr's files despite having a legal duty to do so, and that the jury could choose to infer that the information in those files would have been adverse to the defendants. Having encouraged the trial court to structure the proceeding in this precise manner, the plaintiff cannot now prevail on the ground that opening statements and evidence informing the jury about the defendants' destruction of Lehr's files was, in fact, *necessary* to put the requested instruction in an appropriate context. Cf. *Ferri* v. *Powell-Ferri*, 317 Conn. 223, 236–37, 116 A.3d 297 (2015) ("Our rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.)).

Reaching the opposite conclusion would substantially undercut the grounds on which the trial court concluded that the plaintiff's requested instruction was appropriate in the first instance, including improving judicial economy, avoiding a trial within a trial, and preventing confusion of the jurors. The trial court's decision to exclude the deposition testimony relating to Barner's knowledge regarding the destruction of Lehr's computer demonstrates this point. If the plaintiff had been permitted to lay a trail of "bread crumbs" for the jury using that testimony, the defendants would have been entitled to marshal any admissible evidence showing that this same trail should not be followed. Presenting such a dispute to the jury would necessitate the very "sideshow" that the plaintiff had purposefully forgone in requesting a spoliation instruction before the outset of trial.[24]

_____

[24] The trial court's exclusion of Barner's deposition testimony, like its pretrial ruling on the defendants' motion in limine, placed the plaintiff on

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

Our conclusion that the trial court did not abuse its discretion by declining to admit evidence that could have initially been presented at a sanctions hearing also resolves, in large measure, the plaintiff's claims relating to the restrictions that the court imposed on closing arguments. As this court has previously noted, a trial court acts well within its broad discretion when it restricts the scope of an argument "to prevent comment on facts that are not properly in evidence . . . ." (Internal quotation marks omitted.) *Jackson* v. *Water Pollution Control Authority*, 278 Conn. 692, 713, 900 A.2d 498 (2006); cf. *State* v. *Weatherspoon*, 332 Conn. 531, 551, 212 A.3d 208 (2019) ("[w]hile the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence" (internal quotation marks omitted)); *State* v. *Lopez*, 280 Conn. 779, 803, 911 A.2d 1099 (2007) ("Counsel may comment [on] facts properly in evidence and [on] reasonable inferences to be drawn from them. . . . Counsel may not, however, comment on or suggest an inference from facts not in evidence." (Internal quotation marks omitted.)).[25] Because the trial court ruled at the outset that evidence relating to the conduct underlying Judge Herndon's finding of bad faith would not be admitted or presented to the jury, we agree with the trial court's assessment that such evidence was not proper "fodder" for arguments by counsel.

_____

notice that the trial court intended to hold her to the representations she had made in requesting an adverse inference instruction. If the plaintiff believed that the instruction she had requested could not properly be considered in the absence of Barner's testimony, she could have withdrawn her request for the charge and sought to introduce evidence to prove the elements of spoliation under *Beers*. The plaintiff did not do so. See also footnote 26 of this opinion.

[25] We note that this well established legal principle also undercuts the plaintiff's claim that the trial court's restriction on closing arguments was unforeseeable.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

We note that the plaintiff was not compelled to seek
the benefit of the findings made by Judge Herndon, or
to request an adverse inference instruction as a matter
of law. The plaintiff could have, for example, asked the
trial court to independently review the evidence relating
to the destruction of Lehr's files and, as is typically the
case, argued that any evidence ultimately admitted at
trial supported a corresponding instruction.[26] See *Pay-
lan* v. *St. Mary's Hospital Corp.*, 118 Conn. App. 258,
264, 983 A.2d 56 (2009) (discussing whether plaintiff
adduced sufficient evidence at trial to warrant spolia-
tion instruction under *Beers*). The plaintiff could have
also chosen to pursue still other sanctions available for
discovery misconduct under our rules of practice. See
Practice Book § 13-14. The plaintiff, as a matter of strat-
egy, chose a different path.[27] Accordingly, we decline
to conclude that the trial court abused its discretion by
precluding evidence and arguments relating to spolia-
tion in the present case.[28]

[26] The plaintiff also did not seek to revert to such a procedure after the
trial court granted the defendants' motion in limine and denied her motion
for permission to "inform" the jury of the issues relating to spoliation. Both
of those rulings, which were issued before the commencement of trial,
clearly indicated that the court intended to severely restrict, if not entirely
preclude, evidence and arguments relating to the defendants' destruction
of Lehr's files.

[27] The plaintiff raises two ancillary arguments warranting brief attention.
First, the plaintiff argues that the trial court's decision to instruct the jury
that an adverse inference was permissible as a matter of law merely relieved
her of the burden of proving spoliation. That ruling, the plaintiff argues,
should have done nothing to prevent her from informing the jury of the
defendants' unlawful destruction of evidence. This argument ignores the
fact that presenting such evidence to the jury would necessitate the very
same "trial within a trial" that the court's decision to give an adverse infer-
ence instruction was, itself, expressly designed to avoid. Second, the plaintiff
argues that the restrictions imposed by the trial court run contrary to a
"strong public policy . . . of seeking to deter spoliation by product liability
defendants." We find this argument unpersuasive because the trial court,
in fact, granted the plaintiff's requested form of relief for spoliation in the
present case.

[28] This conclusion is a relatively narrow one. This case does not require
this court to determine whether a spoliation instruction was required, or

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

II

The plaintiff next claims that the trial court improperly excluded certain portions of a video recorded deposition of Christopher Corsico, the defendants' senior vice president for clinical development, from her case on rebuttal. The defendants respond by arguing, inter alia, that the trial court's ruling was correct because the proffered testimony did not contradict testimony presented by their expert witnesses. We agree with the defendants.

The following additional facts are relevant to our discussion of this claim. During their case-in-chief, the defendants called two expert witnesses, Stanley Schneller, a cardiologist, and Michelle Anderson, a gastroenterologist, to testify on the issue of causation. Schneller testified that the decedent's gastrointestinal bleed had resolved three days after she arrived at the hospital and that a "multiplicity of other coexisting medical problem[s]" had caused her death. Specifically, Schneller testified that "acute kidney injury, chronic kidney disease, retroperitoneal fibrosis, and occult neoplasia" directly caused the decedent's death, and that those conditions were unrelated to her use of Pradaxa or her gastrointestinal bleed. See footnote 3 of this opinion. Anderson's testimony supported the same conclusion.

After the defendants rested, the plaintiff sought to introduce, as rebuttal, a brief segment from Corsico's February, 2014 video recorded deposition. During that deposition, Corsico was asked: "[D]o you understand that there can be a series or a cascade of events that

whether the instruction ultimately provided to the jury was proper. See footnote 6 of this opinion. Simply put, we only conclude that, in light of the representations made to the trial court in seeking an instruction in the present case, the plaintiff cannot prevail on her claim that the trial court improperly precluded evidence and arguments related to spoliation.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

can ultimately lead to one's demise that may be precipitated by a gastrointestinal bleed?'' Corsico answered in the affirmative. The defendants' counsel objected, arguing that the admission of that testimony as rebuttal would be improper because it did not conflict with testimony from either Schneller or Anderson. In response, the plaintiff's counsel argued that Corsico's testimony undercut Schneller and Anderson's conclusion that, because the decedent's gastrointestinal bleed had stopped, it did not cause her death.

The trial court ultimately sustained the defendants' counsel's objection, aptly noting: ''I just don't see how . . . Corsico's testimony . . . rebuts testimony by either . . . Schneller or . . . Anderson because . . . Corsico, in this [question and answer], was not specifically asked about a [gastrointestinal] bleed that had ended; nor were [either] Schneller [or] Anderson asked [whether it is] possible that a [gastrointestinal] bleed can lead to a cascade of events that ultimately led to one's death.''

''It is well settled that the admission of rebuttal evidence lies within the sound discretion of the trial court.'' *Gomeau* v. *Gomeau*, 242 Conn. 202, 208, 698 A.2d 818 (1997); see also Practice Book § 15-5 (3). ''The issue on appeal is not whether any one of us, sitting as the trial court, would have permitted the disputed testimony to be introduced. The question is rather whether the trial court . . . abused its discretion in not allowing the rebuttal testimony . . . .'' (Internal quotation marks omitted.) Id., 209. ''[R]ebuttal evidence is that which refutes the evidence [already] presented . . . rather than that which merely bolsters one's case.'' (Internal quotation marks omitted.) *State* v. *Wood*, 208 Conn. 125, 139, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988). ''There is no requirement that a rebuttal witness must respond to every alternate theory offered by the defendant . . . a gen-

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

eral contradiction of the testimony given by the defendant is considered permissible rebuttal testimony.''[29] *State* v. *Gray*, 221 Conn. 713, 728, 607 A.2d 391, cert. denied, 506 U.S. 872, 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992); see also 1 K. Broun, McCormick on Evidence (7th Ed. 2013) § 4, p. 16 ("the plaintiff . . . is confined to testimony refuting the defense evidence, unless the trial judge in her discretion permits him to depart from the regular scope of rebuttal").

We agree with the trial court's conclusion that the proffered question and answer from Corsico's deposition was not proper rebuttal because Corsico was not discussing a situation in which a person's gastrointestinal bleed had resolved prior to his or her death. The isolated colloquy from Corsico's deposition establishes only a single, generic proposition: that a gastrointestinal bleed can lead indirectly to death. Such a broad statement does not generally contradict Schneller's and Anderson's more precise testimony that, in this particular case, the decedent's death was caused by other medical conditions and not the gastrointestinal bleed, which had resolved more than two weeks before her death.[30] In essence, the experts were asked different hypothetical questions, the answers to which were not necessarily contradictory.[31] As a result, we conclude

---

[29] The plaintiff argues that the trial court's ruling was based on the erroneous legal conclusion that rebuttal evidence must *directly* contradict testimony presented by the defendants. Our independent review of the record has, however, located no support for the contention that such a standard was applied in the present case.

[30] The plaintiff does not argue that she was prohibited from calling additional expert witnesses to rebut the testimony from Schneller and Anderson on either the decedent's unrelated medical conditions or the results of the decedent's gastrointestinal bleed.

[31] The plaintiff asserts that Corsico's recognition that a gastrointestinal bleed can lead to a fatal cascade was relevant and, indeed, crucial to proving her case. Specifically, the plaintiff argues that such testimony (1) would have helped to bolster her own evidence on causation, (2) would have precluded the defendants from making certain arguments in closing, and (3) was clearly important in light of the jury's ultimate verdict. None of these arguments, however, relate to whether the trial court erred by declining

335 Conn. 547 NOVEMBER, 2020 575

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

that the trial court did not abuse its discretion by excluding Corsico's testimony from the plaintiff's case on rebuttal.

III

The plaintiff's third claim is that the trial court improperly granted the defendants' motion for summary judgment on a design defect claim related to the defendants' failure to develop and market a reversal agent for Pradaxa, pursuant to the impossibility preemption doctrine. In response, the defendants assert that the trial court's preemption analysis was correct because marketing a reversal agent would have required independent approval by the FDA. We agree with the defendants.

The following additional facts and procedural history are relevant to our consideration of this claim. The FDA approved Pradaxa in 2010. Five years later, after the decedent's death, the defendants obtained approval from the FDA to sell idarucizumab, a chemical reversal agent for Pradaxa marketed under the brand name Praxbind. Because Praxbind was not available at the time of the decedent's gastrointestinal bleed, kidney dialysis was required to remove dabigatran etexilate, the active ingredient in Pradaxa, from her bloodstream. As a result, the decedent's gastrointestinal bleed took three days to stop.

to admit Corsico's testimony *as rebuttal*. See, e.g., *DiMaio* v. *Panico*, 115 Conn. 295, 298, 161 A. 238 (1932) ("The rule upon this subject is a familiar one. When, by the pleadings, the burden of proving any matter in issue is thrown upon the plaintiff, he must, in the first instance, introduce all the evidence upon which he relies to establish his claim. He cannot, as said by Lord Ellenborough, go into half his case, and reserve the remainder." (Internal quotation marks omitted.)). Finally, the plaintiff argues that the trial court should have admitted Corsico's testimony because presentation of that evidence would not have taken much time. Although the trial court may well have been entitled to weigh that fact in reaching its decision; see *Gomeau* v. *Gomeau*, supra, 242 Conn. 211; we decline to find an abuse of discretion on that basis alone.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

In the present case, the plaintiff sought to advance a claim that the defendants could have brought Praxbind to market earlier and that, because they did not do so, the decedent's gastrointestinal bleed was prolonged. The plaintiff claimed, in particular, that the defendants had defectively designed Pradaxa by failing to seek concurrent approval for a reversal agent. The defendants subsequently filed a motion for summary judgment, arguing that, because the FDA had not approved Praxbind before the decedent's death, the plaintiff was foreclosed from pursuing a design defect claim predicated on its absence. Specifically, the defendants argued that the reasoning set forth in *Mutual Pharmaceutical Co.* v. *Bartlett*, 570 U.S. 472, 133 S. Ct. 2466, 186 L. Ed. 2d 607 (2013), and *PLIVA, Inc.* v. *Mensing*, 564 U.S. 604, 131 S. Ct. 2567, 180 L. Ed. 2d 580 (2011), clearly established that such claims are preempted by federal law. The trial court reached the same conclusion and, accordingly, granted the defendants' motion for summary judgment on that claim.[32]

"The standard of review on summary judgment is well established. Summary judgment shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal

---

[32] The trial court also concluded that the defendants were also entitled to summary judgment on this claim because Praxbind was a "different product as a matter of law and not a design element of Pradaxa." Because we conclude that the trial court properly granted the defendants' motion for summary judgment on federal preemption grounds, we need not consider this aspect of the trial court's ruling.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

quotation marks omitted.) *NetScout Systems, Inc.* v. *Gartner, Inc.*, 334 Conn. 396, 408, 223 A.3d 37 (2020); see also *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 314 Conn. 433, 447, 102 A.3d 32 (2014) ("[w]hether state causes of action are preempted by federal statutes and regulations is a question of law over which our review is plenary").

The supremacy clause of the United States constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. The dictates of that provision require state law to yield to the extent that it conflicts with federal law. See, e.g., *Freightliner Corp.* v. *Myrick*, 514 U.S. 280, 287, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995). Such a conflict is implicit where, for example, it is "impossible for a private party to comply with both state and federal requirements . . . ." (Internal quotation marks omitted.) Id. There is, however, "a strong presumption against federal preemption of state and local legislation." (Internal quotation marks omitted.) *Murphy* v. *Darien*, 332 Conn. 244, 249, 210 A.3d 56 (2019), cert. denied sub nom. *Metro North Commuter Railroad Co.* v. *Murphy*, U.S. , 140 S. Ct. 847, 205 L. Ed. 3d 468 (2020).

We begin our analysis of whether such a conflict exists in the present case with a brief review of three decisions from the United States Supreme Court examining the question of impossibility preemption in the pharmaceutical context. The plaintiff in *Wyeth* v. *Levine*, 555 U.S. 555, 558, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009), brought an action in a state court alleging, among other things, that she would have benefited from certain additional warnings in the label for a particular brand-name drug. After extensively reviewing federal law relating to drug labeling, the United States Supreme

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

Court concluded that the plaintiff's state law claim was not preempted because a particular federal regulation, in fact, would have permitted the defendant to unilaterally add such additional warnings to the drug's label, while remaining in compliance with federal law. Id., 568–72, citing 21 C.F.R. § 314.70 (c) (6) (iii) (2008).[33]

The plaintiffs in *PLIVA, Inc.* v. *Mensing*, supra, 564 U.S. 608–609, also alleged the absence of adequate warning labels. The defendants in that action argued on appeal that, as manufacturers of generic drugs, they could not make unilateral changes to the labels of generic drugs. Id., 610. The United States Supreme Court agreed, concluding that the plaintiffs' claim was preempted because FDA regulations required manufacturers of generic drugs to simply mirror the labeling of their brand-name counterparts.[34] Id., 614, 624. In reach-

---

[33] The court noted that the FDA retained authority to retrospectively reject such unilateral changes to the warnings but declined to find impossibility preemption on that ground in the absence of "clear evidence" that the FDA would have done so. *Wyeth* v. *Levine*, supra, 555 U.S. 571. The plaintiff in the present case asserts that a recent United States Supreme Court case explaining that particular standard, *Merck Sharp & Dohme Corp.* v. *Albrecht*, U.S. , 139 S. Ct. 1668, 203 L. Ed. 2d 822 (2019), stands for the broad proposition that impossibility preemption "only applies when a defendant can affirmatively show that it attempted to get the FDA to allow the safer alternative proposed by the plaintiff and the FDA affirmatively and officially rejected it." (Footnote omitted.) We disagree. The clear evidence standard in *Wyeth* applies only when a defendant seeks to prove that compliance with a state law obligation remains impossible *notwithstanding its ability to act unilaterally under federal law*. See *Gibbons* v. *Bristol-Myers Squibb Co.*, 919 F.3d 699, 708 (2d Cir. 2019) (describing "clear evidence" standard). The brand-name drug manufacturers in *Albrecht* and *Wyeth*, for example, could have satisfied their state law obligation to provide a label with an adequate warning by unilaterally making label amendments. See 21 C.F.R. § 314.70 (c) (6) (iii). No similar federal law would have permitted the defendants in the present case to market Praxbind unilaterally and, as a result, *Albrecht* is inapposite.

[34] The court reasoned as follows: "To be sure, whether a private party can act sufficiently independently under federal law to do what state law requires may sometimes be difficult to determine. But this is not such a case. Before the [defendants] could satisfy state law, the FDA—a federal agency—had to undertake special effort permitting them to do so. To decide

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

ing that conclusion, the court specifically rejected the plaintiffs' argument that proving impossibility would require the defendants to affirmatively demonstrate that the FDA would have rejected stronger warnings if they had been proposed. Id., 620. The relevant inquiry, the court held, was whether the defendants "could *independently* do under federal law what state law requires . . . ." (Emphasis added.) Id.[35]

The United States Supreme Court extended this reasoning to a state design defect claim two years later in *Mutual Pharmaceutical Co.* v. *Bartlett*, supra, 570 U.S. 472. The plaintiff in that case took a generic drug, sulindac, and suffered a severe adverse reaction that was not mentioned in the drug's warning label. Id., 477–78.[36] The plaintiff subsequently brought an action, alleging that sulindac was " 'unreasonably dangerous' " under state law and obtained a verdict in her favor. Id., 479, 486. On appeal, the United States Supreme Court noted that, to satisfy the obligation imposed by state tort law, the defendant would have had to either (1) alter sulin-

these cases, it is enough to hold that when a party cannot satisfy its state duties without the Federal Government's *special permission and assistance*, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." (Emphasis added.) *PLIVA, Inc.* v. *Mensing*, supra, 564 U.S. 623–24.

[35] Accepting the plaintiffs' argument, the court concluded, "would render conflict pre-emption largely meaningless because it would make most conflicts between state and federal law illusory. We can often imagine that a third party or the Federal Government *might* do something that makes it lawful for a private party to accomplish under federal law what state law requires of it. . . . If these conjectures suffice to prevent federal and state law from conflicting for Supremacy Clause purposes, it is unclear when, outside of express pre-emption, the Supremacy Clause would have any force." (Emphasis in original.) *PLIVA, Inc.* v. *Mensing*, supra, 564 U.S. 620; cf. footnote 33 of this opinion.

[36] As a result of a comprehensive review commenced in 2005, the year after the plaintiff in *Bartlett* was prescribed sulindac, the FDA recommended the inclusion of such a warning in sulindac's label. See *Mutual Pharmaceutical Co.* v. *Bartlett*, supra, 570 U.S. 478–79.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

dac's composition or (2) strengthen the warning label. Id., 483–84. The court found that the defendant was legally foreclosed from redesigning sulindac as a generic manufacturer and that, in any event, such alterations were physically impossible in light of sulindac's simplistic composition. Id. The court, citing its decision in *Mensing*, also concluded that the defendant, as a generic manufacturer, was prohibited by federal law from strengthening the warnings in sulindac's label. Id., 486. As a result, the court concluded that the plaintiff's state tort claim was preempted. Id., 486–87.

Our review of these decisions compels us to conclude in the present case that the trial court properly granted the defendants' motion for summary judgment as to the plaintiff's design defect claim. In order to cure the design defect alleged by the plaintiff, the defendants would have had to bring Praxbind to market before the decedent's gastrointestinal bleed in 2014. Because there is no dispute that Praxbind was not approved by the FDA until 2015, the defendants could not have satisfied their alleged state law duty to the decedent without marketing an unapproved drug in violation of federal law. In light of that conflict, the trial court correctly concluded that the plaintiff's design defect claim based on the absence of a reversal agent for Pradaxa was preempted. See *PLIVA, Inc.* v. *Mensing*, supra, 564 U.S. 623–24 ("when a party cannot satisfy its state duties without the [f]ederal [g]overnment's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for [preemption] purposes").

The plaintiff claims that the test for preemption set forth in *Mensing* and *Bartlett* is inapplicable to present case because those cases do not involve brand-name drugs. We disagree. Although the different levels of control afforded to brand-name and generic manufac-

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

turers by federal labeling regulations informed the court's *analysis* in those cases, the nature of the underlying test remained consistent: whether the defendant "could *independently* do under federal law what state law requires . . . ." (Emphasis added.) Id., 620. Because the claim relating to the development and marketing of Praxbind in the present case does not relate to labeling, the plaintiff's attempt to rely on the distinctions between generic and brand-name manufacturers discussed in *Mensing* and *Bartlett* is unavailing. See *Yates* v. *Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, 808 F.3d 281, 296–97 (6th Cir. 2015) ("contrary to [the plaintiff's] contention that the impossibility preemption in *Mensing* and *Bartlett* is limited to generic drugs, we view *Levine*, *Mensing*, and *Bartlett* as together stating the same test for impossibility preemption").

The plaintiff's remaining arguments against preemption do not warrant a different result. First, the plaintiff's assertion that it was *technologically* feasible to develop Praxbind before the decedent's death is insufficient to preclude preemption. Although such practical considerations may sometimes *limit* the options available to a manufacturer; see *Mutual Pharmaceutical Co.* v. *Bartlett*, supra, 570 U.S. 484; that fact is inapposite to the question of whether marketing Praxbind in 2014 would have required the FDA's "special permission and assistance . . . ."[37] *PLIVA, Inc.* v. *Mensing*, supra, 564 U.S. 623–64. For similar reasons, we are also unpersuaded that the FDA's subsequent approval of Praxbind in 2015 is dispositive. The possibility that the FDA would have looked favorably on an earlier application does nothing to alter the fact that, at the time of the decedent's death, the defendants were prevented from unilaterally marketing Praxbind under federal law. See footnote 35 of this opinion. Indeed, the United States

---

[37] We likewise reject the plaintiff's arguments relating to evidentiary admissibility and general foreseeability because they do not inform this analysis.

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

Supreme Court found that the plaintiff's failure to warn claim in *Bartlett* was preempted notwithstanding the fact that, shortly after her injuries, the FDA agreed with her assessment that sulindac's label should include a stronger warning. See footnote 36 of this opinion.

For the foregoing reasons, we agree with the trial court's assessment that the plaintiff's design defect claim relating to Praxbind was preempted by federal law.[38] As a result, we conclude that trial court properly granted the defendants' motion for summary judgment on that claim.

IV

The plaintiff's final claim is that the trial court committed reversible error by issuing a curative instruction to the jury after closing arguments. Specifically, the plaintiff claims that the trial court abused its discretion by instructing the jury that it could not hold the defendants liable for failing to conduct tests described in a particular exhibit. In response, the defendants contend that the trial court's instruction was merited because

---

[38] We note that courts in other jurisdictions considering related cases have reached the same conclusion. See *Ridings* v. *Maurice*, Docket No. 15-00020-CV-W (JTM), 2019 WL 4888910, *6 (W. D. Mo. August 12, 2019) (holding that plaintiffs' design defect claims were preempted "insofar as they are premised on the failure of Boehringer to develop, seek and obtain approval for and/or market a reversal agent for Pradaxa sooner that it did" and noting that issue of feasibility was "immaterial"); *Chambers* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, Docket No. 4:15-CV-00068 (CDL), 2018 WL 849081, *13 (M. D. Ga. January 2, 2018) ("Regardless of when Boehringer started the process, Praxbind approval still required the FDA's 'special permission and assistance.' Boehringer could not unilaterally offer Praxbind to physicians. Therefore, initiating the process that *may* have led to Praxbind's approval does not enable Boehringer to comply with both federal and state law. Further, Boehringer was not required to cease production of Pradaxa until Praxbind was approved to comply with federal and state law. . . . Therefore, [the] [p]laintiff's design defect claim is also preempted. [Citation omitted; emphasis in original.]); but see *In re Xarelto (Rivaroxaban) Products Liability Litigation*, Docket No. 2592 (EEF), 2017 WL 1395312, *3 (E.D. La. April 13, 2017).

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

the plaintiff improperly used that exhibit to advance a preempted failure to test claim in closing argument. We review this claim for an abuse of discretion. See, e.g., *State* v. *Northrop,* 213 Conn. 405, 422 n.13, 568 A.2d 439 (1990). Applying that standard to the arguments and record before us, we find no reversible error.

The following additional facts and procedural history are relevant to our analysis of this claim. Before the commencement of trial, the court granted in part a motion in limine filed by the defendants seeking to "exclude evidence, testimony, or argument regarding [a] 110 [milligram] dose" of Pradaxa. In that ruling, the trial court acknowledged that such evidence might be relevant to the plaintiff's claim that the defendants had failed to adequately warn physicians about the risk of bleeding associated with the 150 milligram dose pre-scribed to the decedent and, accordingly, deferred rul-ing on the admissibility of the evidence for that purpose until trial. The court also concluded, however, that such evidence could not be used to prove that the defendants negligently failed "to test, study, investigate, or pursue the various action items identified by the FDA in order to secure approval of the 110 [milligram] dose in the United States" because such a failure to test claim would be preempted by federal law.[39] During trial, the court consistently applied this dichotomy when ruling

---

[39] The plaintiff contends, in a conclusory fashion, that the trial court's legal conclusion on preemption was incorrect and that, as a result, the trial court improperly excluded evidence regarding certain correspondence between the defendants and the FDA discussing a 110 milligram dose of Pradaxa. Specifically, the plaintiff argues that, because the information con-tained within those documents shows that the defendants could have contin-ued to pursue FDA approval of that lower dose, the trial court incorrectly concluded that the plaintiff's related, failure to test claim was preempted. For the reasons discussed previously in this opinion, this argument lacks merit. See footnote 35 of this opinion. To the extent that the plaintiff's brief implies evidentiary error on different grounds, we find those claims to have been inadequately briefed. See, e.g., *Connecticut Light & Power Co.* v. *Gilmore,* 289 Conn. 88, 124, 956 A.2d 1145 (2008).

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

on objections relating to evidence discussing a 110 milligram dose.

The defendants' counsel gave the following closing argument on the plaintiff's failure to test claim:[40] "The failure to test, you've literally not been given the nature of a test that should be done. Instead what you've been told is we did do a lot of study of this issue, we went as far we could, we went further than others did, and we came to the view that we couldn't go farther, a view that the FDA echoed. A failure to test, no." Notwithstanding the trial court's previous ruling, the plaintiff's counsel responded by drawing the jury's attention to a document, admitted into evidence as exhibit 23, discussing in particular detail a "potential path forward" for the 110 milligram dose previously proposed by the FDA. The trial court concluded that the plaintiff's counsel's argument had improperly suggested to the jury that the defendants could be held liable for failing to pursue a 110 milligram dose and, as a result, gave the following curative instruction: "[M]embers of the jury, sometimes in closing arguments things are said by one or more lawyers that needs correction by the court. It's not uncommon for that to happen. . . . [I]t was suggested that you look at exhibit 23 during your deliberations. I am instructing you that you may not hold [the defendants] liable for a failure to conduct the testing outlined in exhibit 23."

The plaintiff's principal argument is that her use of exhibit 23 was proper because the defendants had

---

[40] The trial court aptly summarized the failure to test claims ultimately presented to the jury in its instructions as follows: "The plaintiff claims that [the defendants] failed to adequately test, study, and investigate Pradaxa's safety issues, specifically, that [the defendants]: (1) failed to study, test, and investigate plasma concentrations so as to maximize stroke prevention and minimize risk of bleeding relating to Pradaxa and, (2) failed to study, test, and investigate Pradaxa's relationship to gastrointestinal issues and gastrointestinal bleeding."

Boone *v.* Boehringer Ingelheim Pharmaceuticals, Inc.

"opened the door" to it during their own closing argument. We disagree. This defendants' closing argument only broadly discussed the plaintiff's failure to test claim. See footnote 40 of this opinion. The "potential path forward" described in exhibit 23, by contrast, discusses the prospect of FDA approval for a 110 milligram dose. As a result, the defendants did not open the door to the plaintiff's use of that exhibit in closing.

The plaintiff also argues that the trial court instructed the jury to "disregard" a full exhibit and that doing so infringed on her right to use that evidence in support of her claims. The trial court's instruction, however, only precluded the jury from considering a single exhibit to support a particular claim that it had determined was preempted under federal law. Such a restriction was not improper. Finally, the plaintiff claims that she was unfairly prejudiced because the trial court had singled out her argument before the jury as doing "something wrong . . . ." Again, we disagree. The trial court's instruction was brief, contained no explicit reprimand, and was conveyed using reasonably measured language. In fact, the court described such instructions as "not uncommon . . . ." Under these circumstances, we decline to conclude that the trial court abused its discretion by issuing the challenged curative instruction to the jury.

The judgment is affirmed.

In this opinion the other justices concurred.